476 S.E.2d 702

**Steven F. McDUFFIE, Respondent,**

v.

**Thomas L. O'NEAL, Patricia O'Neal, Joseph E. Minshew & Blue Flame Gas Co., Inc., of Mt. Pleasant, Defendants,**

**of whom Thomas L. O'Neal and Patricia O'Neal are, Appellants.**

No. 2553.

Court of Appeals of South Carolina.

Heard June 4, 1996.

Decided Aug. 12, 1996.

298

300

Stephen P. Groves, Michael A. Molony and Stephen L. Brown, Young, Clement, Rivers, & Tisdale, Charleston, for appellants.

Nicholas C. Sottile, of Sottile & Hopkins, of Mt. Pleasant; and James B. Richardson, Jr., Svalina, Richardson & Smith, Columbia, for respondent.

STILWELL, Judge:

Steven F. McDuffie brought this stockholder action against Thomas L. O'Neal, Patricia O'Neal, Joseph E. Minshew, and Blue Flame Gas Co., Inc. of Mt. Pleasant (Blue Flame MTP), a closely held corporation, alleging, among other things, misappropriation of Blue Flame MTP's funds by the defendants and stockholder oppression. The master's order found (1) Blue Flame MTP was entitled to judgment for misappropriation of corporate funds against the O'Neals in the amount of $239,584, and against Minshew in the amount of $30,550; (2) McDuffie and O'Neal were equal owners of Blue Flame MTP; (3) Blue Flame MTP and/or Thomas O'Neal was required to purchase McDuffie's shares in the corporation for $467,317; (4) upon payment to McDuffie for his stock, McDuffie was to reimburse Thomas O'Neal $35,000 for the amount paid by Thomas O'Neal to Minshew for the 2½ shares of stock that were realigned to McDuffie; and (5) McDuffie was entitled to judgment against the O'Neals for $15,918, and against Minshew for $1,967.40, representing their pro rata shares of McDuffie's attorneys' fees and costs.

The O'Neals appeal, alleging error in (1) the value placed upon Blue Flame MTP, (2) the finding that the expenditures of corporate funds by the O'Neals were misappropriations, (3) the master's treatment of a $100,000 bonus to Thomas O'Neal,

(4) the finding that McDuffie and O'Neal were 50/50 owners and, finally, (5) the holding that the action was not barred by the applicable statute of limitations or by equitable estoppel. We affirm as modified.

## FACTUAL BACKGROUND

In September of 1982, McDuffie approached Minshew about starting a retail propane business in Mt. Pleasant. Minshew, who operated a propane business in Hollywood and Charleston, had the resources to establish the business. Minshew testified he was interested so that he could provide a business opportunity for his nephew, Thomas O'Neal, who also worked for him. Minshew variously testified that the startup business was his, or that it was primarily O'Neal's. McDuffie testified, however, that, at its inception, the business began as a 50/50 partnership between he and O'Neal, with Minshew providing the financing.

It is undisputed that Minshew, Thomas O'Neal, and McDuffie reached an informal agreement whereby Minshew and his corporation, Blue Flame Company, Inc. of Charleston (Blue Flame Charleston), would finance and provide the experience and equipment necessary for the operation of Blue Flame MTP. Minshew provided approximately $60,000 during the business's first year of operation. In the early years, McDuffie performed the field work, and Patricia O'Neal, Thomas O'Neal's wife, answered the telephones, dispatched the work orders, and managed the financial books and accounting. Thomas O'Neal, who continued to work at Blue Flame Charleston, assisted on weekends and other occasions. Thomas O'Neal began working exclusively for Blue Flame MTP in either 1987 or 1988.

In December of 1983, Blue Flame MTP was incorporated, and ten shares of stock were issued. McDuffie and Thomas O'Neal each received one share, and Minshew received eight shares. McDuffie testified Minshew held the eight shares as collateral or security for the money owed to Blue Flame Charleston, but he and Thomas O'Neal remained equal owners of the business. There were no written records or corporate resolutions documenting this arrangement.

According to McDuffie, when the indebtedness was repaid to Blue Flame Charleston, Minshew's eight shares were to be

turned back to the corporation and, as a consequence, McDuffie and Thomas O'Neal would remain equal owners. Minshew testified he initiated the incorporation of the business in order to limit his liability. He further testified he received eight of the ten shares because "it was [his] deal." The corporate accountant testified that tax returns filed prior to incorporation indicated that McDuffie and Thomas O'Neal were equal partners.

On February 15, 1985, Minshew transferred one of his eight shares of stock in Blue Flame MTP to Thomas O'Neal doubling O'Neal's ownership interest. McDuffie testified he did not know about this stock transfer until 1989. Minshew testified, however, that the corporate stock certificate evidencing the transfer contained McDuffie's signature. McDuffie admitted it was his signature on the certificate, but testified he did not realize at the time what he was signing. Rather, he testified he was merely executing corporate documents that were placed in front of him, as was his custom.

In January of 1989, Minshew decided to withdraw from any involvement with Blue Flame MTP. Minshew asked his attorney to transfer 5½ shares of his stock to Thomas O'Neal and 1½ shares to McDuffie. McDuffie objected to this unequal distribution of Minshew's stock, but he testified Minshew told him that if he would not accept 1½ shares, he would get nothing at all.

Simultaneous with this transaction, Thomas O'Neal was paid a $100,000 bonus by the corporation. The corporation borrowed the $100,000 from the Bank of South Carolina. The borrowing and the bonus served a dual purpose, i.e., to provide funds for O'Neal to purchase the stock from Minshew, and to decrease the value of the corporation, enabling O'Neal and McDuffie to purchase Minshew's stock. McDuffie took out a personal loan to pay for his portion of Minshew's stock.

In June of 1991, McDuffie came to suspect Thomas O'Neal and his wife, Patricia O'Neal, had misappropriated funds. This lawsuit followed shortly thereafter.

## ANALYSIS OF LAW

A shareholder's derivative action is one in equity. *Pelfrey v. Bank of Greer,* 270 S.C. 691, 244 S.E.2d 315 (1978).

So, too, is an action for stockholder oppression. *See Hite v. Thomas & Howard Co. of Florence,* 305 S.C. 358, 409 S.E.2d 340 (1991), *overruled on other grounds by Huntley v. Young,* 319 S.C. 559, 462 S.E.2d 860 (1995) (characterizing as equitable the relief provided by S.C.Code Ann. § 33–14–310(d)). In an action in equity referred to the master for final judgment with direct appeal to the supreme court, this court may view the evidence to determine facts in accordance with its own view of the evidence. *Tiger, Inc. v. Fisher Agro, Inc.,* 301 S.C. 229, 391 S.E.2d 538 (1989). We are not required, however, to disregard the findings of the trial court. *Id.*

## I. VALUATION OF BLUE FLAME MTP

The O'Neals contend the master erred, not in his decision to fashion a buyout remedy, but in the valuation he placed upon the corporation. They assert there was insufficient probative accounting and audit evidence to sustain his determination of the fair market value of Blue Flame MTP.

In determining the fair market value of a corporation on the date of liquidation, the court should consider (1) the corporation's net asset value, (2) its market value, and (3) its earning or investment value. After these factors have been considered and determined, they should then be weighed as to their relative bearing upon the ultimate question of the fair value of the dissenter's stock. *Santee Oil Co. v. Cox,* 265 S.C. 270, 217 S.E.2d 789 (1975); *Dibble v. Sumter Ice and Fuel Co.,* 283 S.C. 278, 322 S.E.2d 674 (Ct.App.1984).

"Fair value" does not restrict the appraising court to the use of any one method of valuation. *Santee,* 265 S.C. at 273, 217 S.E.2d at 791. In essence the trial court must undertake to compute the fair value of the corporate property as "an established and going business." *Id.* When attempting such an evaluation, each case must be decided upon its own facts and circumstances. *Id.*

Here, the master heard testimony from two expert witnesses concerning the valuation of Blue Flame MTP. McDuffie called Joe M. Gasaway, who had been involved in the propane gas business for approximately 50 years. He testified he operated a company entitled Propane Consulting Service, which handles appraisals of gas businesses for purchasers and assists in selling primarily large gas businesses.

He testified he had done approximately 40 appraisals, which included 22 locations in South Carolina. Gasaway acknowledged that he had never testified as an expert witness in court and he had no formal training in accounting or finance. Gasaway conducted an asset evaluation of Blue Flame MTP based primarily upon information provided to him by McDuffie, which included estimates of Blue Flame MTP's profit margins, the number of gallons of fuel it owned and its total number of customers, including retail clients. McDuffie also provided Gasaway with lists of vehicles, real estate, equipment, and accounts receivable belonging to the corporation. Based upon his evaluation, which included a review of the foregoing information and an on-site review of Blue Flame MTP's physical plant and tank sites, Gasaway valued Blue Flame MTP at $889,609. Gasaway further testified a buyer would pay a seller a negotiated amount for a covenant not to compete. According to Gasaway's testimony, his valuation did not take into consideration the debts of the corporation or its cash on hand.

Blue Flame MTP retained Gregory Padgett, a certified public accountant, to testify to his valuation of the business as of August 31, 1991, and his analysis of the alleged misappropriations. Padgett testified he had no prior involvement in propane sales and had never valued a propane business before. Padgett testified he reviewed the financial statements and balance sheets, capital costs, the land, and the building to determine the fair market value. Padgett testified he took several approaches in valuing the business, including the income approach and capitalization of earnings approach. Combining the approaches utilized, Padgett valued Blue Flame MTP at $410,000.[1]

McDuffie testified he thought the business as a whole was worth approximately $900,000. He had earlier valued his one share of stock (1/30 of the company) at $30,000. At approximately the same time, O'Neal had valued his interest in the company, which he contended to be 75%, at $750,000. The master concluded this discrepancy was due to the fact that McDuffie was using "book value" and O'Neal was using "market value."

---

1. The master's order indicates Padgett's final valuation was $440,000, but, as we read the record, Padgett's final conclusion was $410,000.

Finally, McDuffie called as a witness a competitor who testified the business's value was $800,000, but further testified that the absence of a covenant not to compete would necessarily affect the valuation of such a business.

Faced with these substantially divergent valuations, the master concluded the fair market value of Blue Flame MTP was $664,500. He reached this value by averaging the valuations of the two expert witnesses. While we do not necessarily recommend this method, we find no error in the master's decision in this case. Faced with conflicting opinions from two apparently qualified experts, both with seemingly reasonable opinions, and not having more reason to accept one than the other, the master split the difference between the two.

We do find, however, that the master failed to consider that Gasaway's valuation did not take into consideration corporate debts or cash on hand. For that reason, we modify the master's valuation so that it reflects an average of Padgett's valuation and an adjusted Gasaway valuation (reduced by the corporate debt and increased by the net cash on hand), for a value of $633,993.80.[2]

The O'Neals also argue that Blue Flame MTP's value was further decreased by the lack of a covenant not to compete. All of the witnesses assumed the existence of a covenant not to compete in making their valuations. The master, in his order on reconsideration, clearly prohibited McDuffie from utilizing any customer list, business manual, or other business procedure of the corporation for three years in competition with Blue Flame MTP. While the master's order is susceptible of the interpretation that McDuffie was prohibited from engaging in competition otherwise, it is certainly not clear in that respect. To the extent that it is necessary, we conclude that the master's order should be clarified to provide that Steven F. McDuffie shall not engage in competition with Blue Flame MTP in the corporation's service area for the corporation's existing residential customers and commercial accounts, and

---

2. The record reflects the corporation's debts at the time of trial were $69,842.77 and its cash on hand was $61,922.19 minus outstanding checks of $23,700.83 for a net cash on hand of $38,221.36. We arrived at our final valuation via the following calculation: (($889,609 − $69,842.77 + $38,221.36) + $410,000)/2 = $633,993.80.

that he shall not utilize any customer list, business manual, or other business procedure of the corporation during this three-year period in connection with any business purpose in Blue Flame MTP's service area.

## II. MISAPPROPRIATION OF CORPORATE FUNDS

The O'Neals argue the master erred in finding all of the corporate transactions McDuffie challenged were misappropriations and claim the majority of the transactions were legitimate.

■ The master's decision not to accept the defendants' explanations for their expenditures was based largely on his determination of the witnesses' credibility, and we, therefore, defer to the master on this issue. *See Epperly v. Epperly,* 312 S.C. 411, 440 S.E.2d 884 (1994) (the trial court is better positioned to judge credibility when there is a conflict in the testimony). The master's findings in every aspect of this case demonstrate that he found McDuffie to be the more credible party.[3]

McDuffie introduced into evidence copies of corporate checks signed by the O'Neals, copies of corporate credit card account statements reflecting charges made by the O'Neals, and a compilation of the items he alleged were misappropriations, totaling $255,593.81. This sum included a $100,000 bonus paid to Thomas O'Neal, $30,500 of directors' fees paid to Patricia O'Neal when there was no evidence that she had ever been elected a director of the corporation, unauthorized or unsubstantiated pay raises paid to Thomas O'Neal, other unexplained American Express credit card charges, and $78,698.36 in unexplained and unauthorized expenditures from the corporate checking account. The master found that the defendants O'Neal "treated the corporate checkbook as their own personal property, all to the detriment of the corporation and its other stockholder" and, by implication, found the attempted explanations of such expenditures from the corporate checkbook to be less than credible.

---

3. The suggestion by Mrs. O'Neal that "intimate apparel" from Victoria's Secret, charged to a company American Express card, might somehow qualify as business clothing was found to be less than credible by the master and, undoubtedly, contributed to his conclusions concerning the overall credibility of the witnesses.

## III. USE OF THE $100,000 BONUS TO CALCULATE DAMAGES

■ The O'Neals assert the master improperly included a $100,000 bonus to Thomas O'Neal twice in his computation of McDuffie's damages. The O'Neals argue the master listed the bonus as one of the O'Neals misappropriations, and also included the bonus when he accepted Padgett's value and averaged it with Gasaway's value to determine the fair market value of the business. We find no error in the master's analysis.

The misappropriated $100,000 was relevant not only in that Thomas O'Neal took the money from a company half-owned by McDuffie, but also because its absence from that year's income would have reflected unfairly upon the corporation's earnings history, thereby artificially reducing the fair market value of the corporation. The master therefore properly considered the $100,000 as a misappropriation and required it to be paid back to the corporation. We discern no error in the master's accepting Padgett's valuation, which presumed a repayment of the $100,000, in calculating the fair value of the corporation for buy-out purposes.

## IV. PERCENTAGE OF OWNERSHIP

The O'Neals argue the master erred in finding that McDuffie and Thomas O'Neal were each entitled to a 50% ownership in Blue Flame MTP, claiming the evidence demonstrated the parties intended for Thomas O'Neal to own 75% and McDuffie to own 25%.

■ Clearly, the parties' versions of what percentage of the company McDuffie owned and what Minshew's and Thomas O'Neal's roles in the business were were in direct conflict. As with the question of the misappropriations, the master's handling of this issue turned on his determination that McDuffie was the more credible party. Furthermore, the partnership's tax returns prior to incorporation support McDuffie's contention that he was initially a 50/50 partner. The presence in Blue Flame MTP's articles of incorporation of a stock transfer restriction requiring that stock be first offered to the corporation prior to transfer also supports the inference that McDuf-

fie was originally a one-half owner of the business. We therefore find the master did not err in finding McDuffie was entitled to 50% ownership of Blue Flame MTP.

## V. STATUTE OF LIMITATIONS AND EQUITABLE ESTOPPEL

The O'Neals also argue the master erred in finding that McDuffie's claims relating to the 1985 and 1989 stock transactions were not barred by the statute of limitations and/or equitable estoppel since the evidence demonstrated McDuffie should have known about the transactions more than two years prior to his bringing this action.

The O'Neals' statute of limitations argument relies on S.C.Code Ann. §§ 33–8–300(e) and 33–8–420(e) (1990), which are applicable to actions by a corporation against a director or officer for loss suffered by the corporation on account of the negligence or bad faith of the officer or director.[4] A review of the complaint reveals, however, that this case was primarily a shareholder derivative suit and an action seeking corporate dissolution pursuant to § 33–14–300, *et seq.* (1990). Accordingly, this is an action in equity, and only the doctrine of laches, not the statute of limitations, applies. *See Pelfrey*, 270 S.C. 691, 244 S.E.2d 315 (a shareholder's derivative action is one in equity); *Hite*, 305 S.C. 358, 409 S.E.2d 340 (characterizing as equitable the relief provided by S.C.Code Ann. § 33–14–310(d)).

As for estoppel, the essential elements of estoppel as related to the party estopped are (1) conduct that amounts to a false representation or concealment of material facts, or, at least, that is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those that the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the

---

**4.** Section 33–8–300(e) provides as follows:

An action against a director for failure to perform the duties imposed by this section must be commenced within three years after the cause of action has accrued, or within two years after the time when the cause of action is discovered, or should reasonably have been discovered, whichever sooner occurs. This limitations period does not apply to breaches of duty which have been concealed fraudulently.

Section 33–8–420(e) is identically worded except that it pertains to actions against corporate officers.

other party; (3) knowledge, actual or constructive, of the real facts. *Southern Dev. Land and Golf Co. v. South Carolina Pub. Serv. Auth.*, 311 S.C. 29, 426 S.E.2d 748 (1993). As related to the party claiming the estoppel, the essential elements are (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) prejudicial change in position. *Id.*

██ Assuming without deciding all other elements of estoppel are established, the O'Neals have not suggested anything that they did or refrained from doing in reliance upon McDuffie's "representations." Accordingly, the master did not err in holding McDuffie's action was not barred by estoppel.

We therefore affirm the master's order, but modify it to require the defendant corporation and/or defendant, Thomas O'Neal, to purchase McDuffie's shares for $452,063.87, and we modify the covenant not to compete as set forth elsewhere in this opinion.

**AFFIRMED AS MODIFIED.**

GOOLSBY and ANDERSON, JJ., concur.