678 S.E.2d 443

**David K. STRAIGHT, Appellant,**

v.

**Michael H. GOSS, Pamela W. Goss, Timberline Building Systems, Inc., Allied Products and Services, LLC, Custom Built Trusses, Inc., Commerce Properties, LLC., and Structural Component Systems, Inc., Respondents.**

**Timberline Building Systems, Inc., Michael H. Goss, and Pamela W. Goss, Third–Party Plaintiffs**

v.

**Eagle's Nest Homes, Inc., Third–Party Defendants.**

No. 4532.

Court of Appeals of South Carolina.

Heard March 3, 2009.

Decided April 16, 2009.

184

Robert L. Buchanan, Jr., of Aiken, for Appellant.

Everett A. Kendall, II, of Columbia, for Respondents.

HUFF, J.:

In this shareholder derivative action, David K. Straight appeals from an order of the special referee finding largely in favor of Michael H. Goss (Goss) and his wife, Pamela W. Goss (Pam). In particular, Straight appeals the referee's findings relating to his claims the Gosses, as directors of Timberline Building Systems, Inc. (Timberline), (1) received excess wages in the nature of salary overrides; (2) misappropriated a corporate opportunity by purchasing property the Gosses then leased to Timberline, which the Gosses thereafter conveyed to their corporation, Commerce Properties, LLC (Commerce Properties), and caused Timberline to pay rent to cover the Gosses' taxes and mortgage on the property and also pay the rent of the Gosses' truss company; (3) misappropriated a corporate opportunity by creating a truss company, Custom Built Trusses, Inc. (CBT), which ultimately was succeeded by the Gosses' company Structural Component Systems, Inc., and used Timberline employees and materials for the benefit of the truss company; and (4) made inappropriate distributions to themselves through another of the Gosses' companies, Allied Products and Services, LLC (Allied). We affirm.

## FACTUAL/PROCEDURAL HISTORY

In 1983, Straight, along with Larry Gandolfi and another person, formed Eagle's Nest Homes, Inc. (Eagle's Nest), a company that distributes panelized buildings through independent representatives. In the spring of 1983, Straight and Gandolfi were searching for a multi-sided house to market and found that a business called Deltec Homes produced a multi-sided, round house. Straight called Deltec and made an appointment with Goss, Deltec's marketing manager.[1] Eagle's Nest purchased panelized houses from Deltec for approximately one year and thereafter purchased the round houses from Kingsberry Homes, a company for which Goss had

---

1. Both Goss and Gandolfi had engineering backgrounds. Goss testified he designed the round houses.

previously worked and to which Goss had returned. Thereafter, Straight, Gandolfi, and Goss began exploring the possibility of starting a new company to manufacture panelized houses for Eagle's Nest.

In January 1986, Goss prepared a prospectus for a company called Timberline Manufacturing, Inc. On February 28, 1986, Straight, Gandolfi, and Goss signed a letter of intent, setting forth the parties' agreement in regard to the formation of the company. In particular, the letter of intent provided the company would be devoted exclusively to the production and delivery of Eagle's Nest homes, with other businesses and products added as warranted from retained earnings. It further stated Eagle's Nest homes would be purchased exclusively from the company, provided that pricing and delivery terms were competitive. The letter of intent also placed responsibility of day-to-day management of the company on Goss as president, and set his compensation at $1,000 a week plus two percent of sales orders, not to exceed $80,000 a year without prior approval of Timberline's board of directors. Goss testified the purpose of Timberline was to capture the manufacturing profits that suppliers Deltec and Kingsberry had previously realized from Eagle's Nest homes.

In September 1986, Timberline Building Systems, Inc. was incorporated by Straight, Gandolfi, Goss, and Pam, with these four likewise listed as the initial directors. However, shortly after incorporation, Straight, Gandolfi, Goss, and Pam each owned twenty-three percent of the company, with the president of Eagle's Nest, John Chester, owning the remaining eight percent, and Goss and Chester became the directors of Timberline's board. Thereafter, Straight and Gandolfi fired Chester from Eagle's Nest, resulting in Chester's dismissal as a director of Timberline in 1991, and Pam's replacement of him on the board.[2]

Timberline manufactured the panelized homes, and Eagle's Nest sold them. As part of its production of the homes, Timberline would fabricate them, provide drawings, codes, and

---

**2.** At some point, Straight acquired Gandolfi's shares in Timberline and the company bought Chester's shares, resulting in Straight owning fifty percent of Timberline and Goss and Pam together owning the remaining fifty percent.

packing lists needed to build the homes, load them, and contact the trucking company for delivery to the job site. At some point, Timberline also manufactured some homes for American Accent Homes, Inc. (American Accent), a company started by Straight and Gandolfi in 1986, which was the only other Timberline customer of any significance.[3] For a period of about four to six years, Timberline provided between eight to twelve houses a year for American Accent. During this time, in March 1990, Straight bought Gandolfi's interest in Eagle's Nest. Straight wanted to shut down American Accent, but Gandolfi instead talked Straight into selling his interest in American Accent to another man, Mr. Helms. While Straight sold his shares in American Accent, Gandolfi retained his shares. A conflict eventually developed between Straight and Gandolfi regarding American Accent. As a result, Straight requested Timberline initiate a lawsuit against American Accent.[4] Timberline subsequently incurred over $184,000 in legal fees related to the action against American Accent.

---

3. The only other evidence of Timberline producing homes for other customers is that it manufactured about four panelized packages for some local individuals as well as one for Goss and one for a Timberline employee.

4. It appears that Straight felt he was "duped" by Gandolfi when Gandolfi talked him into selling Helms his shares in American Accent, but Gandolfi, who was also supposedly selling his shares, either repurchased those shares or negated the transaction in order for Helms and Gandolfi to shut Straight out of American Accents. Goss testified American Accent and Eagle's Nest had the same marketing approach, Straight wanted American Accent out of that market, and Straight told Goss he wanted to "squash" American Accent and he was going to "crush" them because American Accent was competing with Eagle's Nest. Because American Accent had an agreement with Timberline that it would buy houses exclusively from Timberline, Straight believed Timberline could initiate a lawsuit against American Accent to enforce that agreement. Straight, on the other hand, maintained that he had an agreement drawn up between Timberline and American Accent which not only made Timberline an exclusive provider, but also placed limitations on the product Timberline produced for American Accent. Straight contended that American Accent violated the agreement, informing people it could make any type of home, including the round house. While Goss's position was that the lawsuit was instituted solely for Straight's and Eagle's Nest's benefit, Straight asserted it was beneficial to Timberline as well. This lawsuit started around 1994 and ended in 1995 or 1996.

Allied Products and Services, LLC was a separate company set up by Goss and Pam. From 1993 through 1998, Timberline transferred funds to Allied totaling $341,772. According to Goss, the company was set up based on a model of one of Straight's companies, and with the advice of both an accountant and an attorney, for the purpose of distributing equal profits to the Gosses as were distributed to Straight. Allied did not manufacture any products, but did provide some payroll services to Timberline in the early years of the company.

While Timberline initially leased premises for the manufacture of the panelized homes, the leased premises incurred two separate fires over the years and were acquired by a new landlord, who wanted to take over the building occupied by Timberline. Thereafter, Goss and Pam found and purchased at an auction for themselves property (the Wickes property) that met Timberline's needs in August 1997, and in early 1998, Timberline moved to this new facility. Rent was charged to Timberline based on the recommendation of an economic development director as to what constituted competitive rent for that space. The Wickes property was subsequently transferred to Commerce Properties in December 1999.

In June 1998, Pam purchased truss manufacturing machinery and started a company called Custom Built Trusses (CBT). In July 1998, CBT began building trusses in one of the buildings located on the Wickes property. In October 1998, CBT's articles of incorporation were filed listing Pam as the registered agent for and incorporator of the business. CBT supplied the trusses Timberline needed for the manufacture of panelized houses, with cost based on the price charged by Timberline's previous supplier before that company's latest price increase.

Over time, Timberline experienced serious financial difficulties as sales declined substantially. It delivered its last home for Eagle's Nest in March 2000. Goss began closing Timberline down at that time and continued that process until around June of that year. CBT ceased operating on December 31, 2000. In January 2001, Goss and Pam began operating Structural Component Systems, Inc., a company that is the successor of CBT. In April 2001, Straight filed this action. Thereaf-

ter, in June 2005, Timberline filed for bankruptcy and this matter was automatically stayed. Straight moved the bankruptcy court to lift the stay and, as a result of negotiations between Straight and the bankruptcy trustee, the bankruptcy court modified the stay to allow the action to move forward, provided all proceeds recovered in the action be transmitted to the trustee and be property of the bankruptcy estate.

This matter was heard by a special referee by order of reference dated September 29, 2005. The referee noted Straight had abandoned his individual claims and chose to continue on the derivative claims alone, asserting the following four causes of action in his derivative suit: (1) negligent mismanagement; (2) conversion, (3) breach of fiduciary duty, and (4) civil conspiracy. The referee found the specific claims by Straight included the payment of excess wages to the Gosses, the use of Timberline employees and material for CBT, the purchase of the Wickes property and development of the truss business, and the transfer of funds to Allied from Timberline. The referee further noted the Gosses had brought a counterclaim against Straight and a third party claim against Eagle's Nest for money owed Timberline and for minority shareholder oppression.

After considering the evidence, the referee determined (1) no excess salary had been received by the Gosses, (2) the funds initially provided by Timberline for the payment of CBT employees were offset by the trusses delivered to Timberline but not paid to CBT, (3) Timberline did not have the ability to acquire the Wickes property and no funds of Timberline were improperly used to improve the Wickes property for the benefit of Commerce, (4) Timberline did not have the capital and resources necessary for the creation of a truss business and the truss business therefore was not a business opportunity for Timberline, and Timberline was treated fairly in all respects by CBT, and (5) the transfer of funds to Allied, along with certain payments of attorney's fees and special commissions, were essentially distributions of profits to the shareholders, and after considering the distributions made, the Gosses had received $21,449.97 more than Straight in distributions which the Gosses should return to Timberline based upon Straight's assignment of his claims to the company. Further, as equitable considerations, the referee found Straight used

his influence as Timberline's primary customer to continually defeat price increases and used coercion, by continually threatening to remove all his business. He further found Straight made only a nominal initial investment in Timberline, refused to guarantee any bank loans, and risked nothing for his fifty percent ownership of Timberline for which he in turn received large returns. He also determined Straight routinely insisted upon liquidation and distribution of monies from Timberline. He concluded Straight's "conscious harassment of the Gosses" constituted unclean hands, and Straight was seeking to be unjustly enriched by his claims of misappropriated corporate opportunities. The referee determined there was no negligent mismanagement, no misappropriation of corporate assets or opportunities, no breach of fiduciary duty and no civil conspiracy by the Gosses, and found the imposition of a constructive trust sought by Straight would be inappropriate under the circumstances. He also determined Straight came into the court with unclean hands and such a defense could be properly raised in a derivative claim.

## ISSUES

1. Whether the Gosses violated their duties as Timberline's officers and directors by engaging in undisclosed conflict of interest transactions with the corporation and failed to prove the fairness of the transactions.

2. Whether there was a claim stated upon which to offset the amount of the attorney's fees or the special discounts against the conflict of interest transactions.

3. Whether the defense of unclean hands applies to conflict of interest transactions or matters unrelated to the litigation.

4. Whether the common paymaster doctrine applies when employees are paid by one corporation but work exclusively for another when there is no common ownership.

5. Whether corporate directors are liable for misappropriated corporate opportunities when no disclosure was made to disinterested shareholders.

## STANDARD OF REVIEW

A shareholder's derivative action, as well as an action for stockholder oppression, is one in equity. *McDuffie v.*

*O'Neal,* 324 S.C. 297, 302–03 476 S.E.2d 702, 705 (Ct.App. 1996). Therefore, this court may find facts in accordance with our own view of the preponderance of the evidence. *Inlet Harbour v. S.C. Dep't of Parks, Recreation & Tourism,* 377 S.C. 86, 91, 659 S.E.2d 151, 154 (2008). However, we are not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility. *Sloan v. Greenville County,* 356 S.C. 531, 546, 590 S.E.2d 338, 346 (Ct.App.2003).

## LAW/ANALYSIS

### Engaging in Undisclosed Conflict of Interest Transactions

Straight first contends the special referee erred in failing to properly analyze the Gosses' conflict of interest transactions under section 33–8–310 of the South Carolina Code (2006). In particular, he argues the Gosses engaged in three conflict of interest transactions: (1) the payment of salary overrides for the years 1995, 1996, and 1997, (2) the purchase of property and creation of a truss company by the Gosses, initially funded by Timberline assets, and (3) distributions of money to Allied from 1993 to 1998. We disagree.

Section 33–8–310 which governs standards of conduct for directors and officers of a corporation involving conflict of interest transactions, provides as follows:

(a) A conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect interest. A conflict of interest transaction is not voidable by the corporation solely because of the director's interest in the transaction if any one of the following is true:

(1) the material facts of the transaction and the director's interest were disclosed or known to the board of directors or a committee of the board of directors, and the board of directors or a committee authorized, approved, or ratified the transaction;

(2) the material facts of the transaction and the director's interest were disclosed or known to the shareholders entitled to vote and they authorized, approved, or ratified the transaction; or

(3) the transaction was fair to the corporation.

If (1) or (2) has been accomplished, the burden of proving unfairness of any transaction covered by this section is on the party claiming unfairness. If neither (1) nor (2) has been accomplished, the party seeking to uphold the transaction has the burden of proving fairness.

(b) For purposes of this section, a director of the corporation has an indirect interest in a transaction if (1) another entity in which he has a material financial interest or in which he is a general partner is a party to the transaction or (2) another entity of which he is a director, officer, or trustee is a party to the transaction and the transaction is or should be considered by the board of directors of the corporation.

(c) For purposes of subsection (a)(1), a conflict of interest transaction is authorized, approved, or ratified if it receives the affirmative vote of a majority of the directors on the board of directors (or on the committee) who have no direct or indirect interest in the transaction, but a transaction may not be authorized, approved, or ratified under this section by a single director. If a majority of the directors who have no direct or indirect interest in the transaction vote to authorize, approve, or ratify the transaction, a quorum is present for the purpose of taking action under this section. The presence of, or a vote cast by, a director with a direct or indirect interest in the transaction does not affect the validity of any action taken under subsection (a)(1) if the transaction is otherwise authorized, approved, or ratified as provided in that subsection.

(d) For purposes of subsection (a)(2), a conflict of interest transaction is authorized, approved, or ratified if it receives the vote of a majority of the shares entitled to be counted under this subsection. Shares owned by or voted under the control of a director who has a direct or indirect interest in the transaction, and shares owned by or voted under the control of an entity described in subsection (b)(1), may not be counted in a vote of shareholders to determine whether to authorize, approve, or ratify a conflict of interest transaction under subsection (a)(2). The vote of those shares, however, is counted in determining whether the transaction is approved under other sections of Chapters 1 through 20

of this Title. A majority of the shares, whether or not present, that are entitled to be counted in a vote on the transaction under this subsection constitutes a quorum for the purpose of taking action under this section.

§ 33–8–310.

## Salary Overrides

██ Straight contends the special referee erred in finding Goss's salary overrides in 1995, 1996, and 1997 were proper as they were neither disclosed nor approved and, therefore, were only valid if they were fair to the corporation. He argues the Gosses failed to meet their burden to establish fairness under section 33–8–310(b) as they failed to offer any evidence of fairness given the declining business and increased cash needs of Timberline during this time. We disagree.

Straight testified, based on his concern that someone running Timberline would be able to increase salary and diminish the shareholders' ability to pull out profits, the parties agreed a salary of approximately $80,000 a year would be paid to Goss and that any other income he would earn would come from distributions and profits. At trial, he presented a document purporting the Gosses received excess wages of $214,233 in 1995, $66,864 in 1996, and $101,670 in 1997, while the number of packages Timberline produced for Eagle's Nest during those years was declining.

As previously noted, the letter of intent provided Goss was to receive a salary of $1,000 per week plus a sales override of two percent, not to exceed $80,000 per year "without prior approval of Timberline's Board of Directors." Thus, contrary to Straight's testimony, Goss's salary was not strictly limited to $80,000 a year with his only other source of income from the company to be income received as distribution of profits, as the letter of intent clearly contemplates Goss's salary may increase with board approval. The record shows that at a Timberline Board of Directors meeting on May 12, 1993, directors Goss and Pam, after noting Timberline's recent improved profitability, approved an increase in overrides to five and a half percent of sales.[5] At this time, Pam had

---

5. The order of the referee notes that in December 1998, the board reduced the override to three percent of sales.

replaced Chester as a director when Straight and Gandolfi voted Chester off the board. According to Goss, the by-laws required a minimum of two directors, and because Straight and Gandolfi refused to serve on the board, the only other available person to take the position was Pam. Certainly by 1995 and thereafter, the only three shareholders in Timberline were Straight, Goss, and Pam, with Straight owning fifty percent and Goss and Pam owning the remaining fifty percent. Accordingly, Straight was aware from the letter of intent that the board could increase the compensation for Goss. He was further aware it became necessary for Pam to replace Chester on the board when he refused to serve. He therefore knew that Goss and Pam, as the directors, would be determining whether Goss's salary could exceed $80,000 a year.

In addition to Straight's knowledge that Goss and Pam could make changes to the compensation, there is evidence of record that the Gosses made significant financial and sweat equity contributions to Timberline. In particular, although the letter of intent anticipated initial capital requirements of approximately $195,000 or less, with half the amount to be contributed by the Gosses and the other half to be contributed by Straight and Gandolfi, the record shows Straight and Gandolfi actually contributed only $25,000 and refused to co-sign any loans to finance any further necessary capital.[6] According to Goss, the business was ultimately started with $150,000 in funds. Goss stated he and Pam put $25,000 of capital into the business by borrowing from their pension. The parties had agreed the remaining $100,000 was to be borrowed, and the bankers Goss met with requested Straight and Gandolfi co-sign for a loan. However, Straight and Gandolfi adamantly refused to sign any notes. One of the bankers ultimately agreed to loan Timberline money on the Gosses' personal guarantee if Straight and Gandolfi "put up $50,000." The Gosses ultimately gave their personal guarantee to obtain a loan from the bank. Although Straight main-

---

6. It is of further interest to note Goss testified this start-up capital of $25,000 contributed by Straight and Gandolfi was paid for by Eagle's Nest, whereby that company paid for a house manufactured by Kingsberry twice, paying Kingsberry for the home and then issuing a $25,000 check to Timberline for the same home, in order to improperly deduct the expense of their capital contribution.

tained he and Gandolfi also provided a $50,000 loan to Timberline, Goss testified this loan was only short term, being made in September and paid off by the following February, and was a way to satisfy their banker and get around the fact Straight and Gandolfi had refused to co-sign on the loan. Thereafter, Goss and Pam guaranteed all of Timberline's loans and letters of credit, at times pledging their own personal assets.[7] Additionally, Goss testified over the course of years he and Pam both worked sixteen hour days, as well as some weekends, and had invested their money and personally guaranteed debts of Timberline.

Paragraph four of the official comments for section 33–8–310 discusses the "fairness" of a transaction and provides as follows:

> The fairness of a transaction for purposes of section 8.31 (Section 33–8–310) should be evaluated on the basis of the facts and circumstances as they were known or should have been known at the time the transaction was entered into. For example, the terms of a transaction subject to section 8.31 (Section 33–8–310) should normally be deemed "fair" if they are within the range that might have been entered into at arms-length by disinterested persons.

Given Straight's knowledge of the compensation parameters set forth by the letter of intent along with his refusal to serve on the board, leaving Pam as the only alternative director, and in consideration of the Gosses' concerted efforts and financial support of Timberline, we believe the Gosses have met their burden of showing the fairness of the additional overrides paid in 1995, 1996, and 1997. Additionally, based upon other equity considerations discussed further in this opinion, we find no error in the referee's determination that the Gosses were entitled to the salaries received during these years.

### Land Purchase and Truss Company

Straight next contends the special referee erred in failing to find improper the Gosses' purchase of the Wickes property

---

7. When Timberline ultimately ceased production, it was still obligated on a $150,000 note. After selling some land owned by Timberline to pay down the note, a balance of approximately $85,000 remained, which the Gosses were forced to assume as they had personally guaranteed the note.

and formation of the truss company without disclosure to Straight. Straight argues the Gosses had a direct interest in the payment of rent by Timberline to themselves, and an indirect interest in the supply of trusses by CBT to Timberline. He asserts these transactions violated the South Carolina Business Corporations Act's statutory approval of such conflicts of interest as provided in section 33–8–310 because there was neither disclosure nor approval.[8] We disagree.

Straight complains the Gosses purchased the Wickes property, appraised at $1,300,000, for only $304,000, and Timberline could have done the same with no out-of-pocket investment required of Timberline or its shareholders. Additionally, he maintains that the rent charged to Timberline enabled the Gosses to make the mortgage payments and pay taxes on the property, and further asserts Timberline paid CBT's rent. As for the truss company, Straight asserts the Gosses failed to disclose the existence of CBT until he confronted Goss in December 1999 after receiving an anonymous clipping in the mail. He claims the Gosses also used Timberline to supply significant labor, materials, and rent for CBT.

### The Wickes Property

The record shows that on November 1, 1991, following the first fire at the property initially leased by Timberline, the Timberline Board approved the negotiation and purchase of land and the construction of a new building for Timberline. While Straight and Gandolfi agreed to such an investment by Timberline, they informed Goss they were unwilling to give any guarantees or make any investment in it. Shortly thereafter, Timberline acquired eight acres of raw land in Hodges, South Carolina. Timberline however remained at the leased premises, where a second fire ultimately occurred on the property in 1994. At this time, Timberline was on a month-to-month lease, and the new landlord decided to take over the

---

8. Straight also summarily asserts the referee further erred in applying the business judgment rule to these transactions, as such a rule is not applicable to conflict of interest transactions. A reading of the referee's order discloses, however, that the referee did not reference this rule in regard to Straight's claims that the land purchase and truss business transactions were conflicts of interest, but rather did so in regard to Straight's assertions of negligent mismanagement of Timberline.

area leased to Timberline for his own use, requiring Timberline to vacate the premises.

Goss testified he and Pam searched Greenwood and the neighboring counties for a suitable location to lease, but were unable to find one that suited Timberline's needs. Eventually, Goss learned that the Wickes property was to be auctioned, and he and Pam subsequently purchased it for $304,000 in August 1997. The Gosses obtained a mortgage in the amount of $415,000, giving their personal guarantee, and used the difference to make improvements to the property. Goss testified Timberline did not buy the property because, in speaking with its banker, he knew Timberline could not borrow the money without Straight's guarantee. When presented with the idea of purchasing land and a building and mortgaging it, Straight clearly indicated to Goss that Straight would have no part of it and Goss would have to "do it alone." Timberline thus did not have the financial ability to secure a mortgage on the property. Additionally, rent of $4,527 a month was charged to Timberline after Goss consulted the executive director of The Greenwood County Economic Alliance as to what constituted competitive rent for that space. Goss further testified he informed Straight of the new rent charged Timberline and Straight "seemed happy with it."

Based on the evidence that Timberline did not have the financial ability to acquire the Wickes property and the rent charged to Timberline was competitive for the area leased, we find no error in the special referee's refusal to find purchase of the Wickes property by the Gosses was improper under section 33–8–310, as the evidence supports the fairness under the circumstances. Additionally, as with the salary overrides, based upon the other equity considerations we find no error in the referee's determination that the transactions involving the Wickes property were reasonable under the circumstances.

### The Truss Business

■ Goss testified that Pam purchased truss machinery and started CBT in the summer of 1998. CBT and Timberline were located in the same compound, on the Wickes property, but Timberline was in one building and CBT was in another. Until a conversation with Straight in December 1999, Goss did not inform Straight about the existence of CBT. He and Pam

borrowed the money in their names to start the business because Straight had made it clear he was not willing to co-sign, he wanted to take out Timberline's available retained earnings, and he had made it abundantly clear he was not willing to engage in any other business opportunities. Goss testified Timberline was "maxed out," it could not borrow the money without back-up guarantees, it did not have the retained earnings needed to engage in a business opportunity, and it could not afford the equipment necessary for a truss business. According to Goss, they were in a difficult situation because Timberline had only one customer, Eagle's Nest, and Straight kept threatening to pull Eagle's Nest's business from them. Given the limitations with Timberline, he and Pam were trying to find a way to keep Timberline operating and to provide another source of income for themselves. Goss explained he did not discuss CBT with Straight before the December 1999 conversation because he had experienced a very difficult year with his son's illness and death, and in his preceding conversations with Straight, Straight had "basically washed his hands of [Timberline]." Additionally, the truss company did not make a profit until 2002, and had he "thrown the [CBT] business losses on top of the Timberline losses," Timberline would have been in an even more difficult situation. Goss stated that at the end of their December 1999 conversation about the Gosses' decision to go into the truss business, Straight indicated to Goss that it was "just fine with him."

Goss maintained that upon advice from his attorney and accountant, CBT and Timberline were operated as separate companies and in arm's length transactions with competitive pricing. The Gosses made improvements to the Wickes property to accommodate Timberline's needs. According to Goss, the only improvements made by Timberline to the property involved the running of electrical and compressor lines the business needed and possibly "another item or two." Goss admitted that for a very short period of time, while his wife was out of town tending to their son's medical situation, some materials ordered for CBT were inadvertently included on the Timberline account, but the matter was corrected in an adjustment at the end of the year. Goss also admitted that some employees who worked exclusively for CBT were paid from

the Timberline payroll account. Goss explained that Timberline had five key employees that were vital to the continued operation of Timberline. Around the time CBT had started, Timberline was having difficulty keeping all these employees on their payroll. Two of Timberline's more experienced and key people were moved into the truss business with the expectation at some point Eagle's Nest business would return. According to Goss and two of the former employees of Timberline and CBT, the two businesses had different managers, different time cards, and different time clocks. Goss testified, and also presented evidence from his accountant, that Timberline incurred expenses with CBT for trusses, and that there was an annual accounting of the goods and services between the two companies. At the conclusion of the reconciliation, Timberline was indebted to CBT in the amount of $14,878.

As for the rent, the testimony does not show, as Straight contends, that Timberline paid CBT's rent. Rather, CBT entered its own lease agreement with Commerce to pay $1,500 a month in rent for a much smaller area than Timberline's. Rent was charged on a prorated basis, with both Timberline and CBT paying $2.50 per square foot. While CBT apparently made only $1,500 in monetary payments, its remaining rent accrued on the books and there is no evidence this rent was paid by Timberline.

Further, CBT charged Timberline the same price Timberline had been paying its previous truss provider before that company announced a fifteen percent price increase. Accordingly, Timberline actually saved that fifteen percent difference when it obtained trusses from CBT. Additionally, Timberline benefited from the arrangement inasmuch as it received custom quotes faster, the quality of the trusses was somewhat superior, it received the trusses themselves more quickly, and it incurred no delivery charge.

Based on the foregoing evidence, we find no error in the referee's determinations that the funds provided by Timberline for the payment of CBT employees were offset by the trusses delivered to Timberline but not paid to CBT, that Timberline did not have the ability to acquire the Wickes property and no funds of Timberline were improperly used to improve the Wickes property for the benefit of Commerce,

and that Timberline did not have the capital and resources necessary for the creation of a truss business and the truss business was not a business opportunity for Timberline. We further find no merit to Straight's assertions the Gosses improperly used Timberline to supply labor, materials, and rent for CBT. Accordingly, we hold the special referee did not err in failing to find the truss company transactions improper under section 33-8-310, as the evidence supports the fairness under the circumstances. Finally, as with the salary overrides and the Wickes property purchase, based upon the other equity considerations we find no error in the referee's determination that the transactions involving the truss business were reasonable under the circumstances.

### Allied Distributions

■ Straight further contends the special referee erred in his determination regarding the Allied distributions to the Gosses. He argues the referee improperly tied the Allied distributions to the American Accent legal fees and special discounts because Goss's testimony on the matter was not credible, it was reasonable for Timberline to incur these fees on its own behalf, and the special discounts were made for legitimate business reasons. We disagree.

Goss testified that Allied was a company they used to enable him to receive an equal amount of distributions from Timberline that Straight received in the nature of legal fees incurred in the American Accent lawsuit and some "special deals" Straight obtained from Timberline. According to Goss, Straight requested Timberline sue American Accent because American Accent was competing with Eagle's Nest in its sale of dealerships.[9] Goss stated the lawsuit did not benefit Tim-

---

9. Goss testified about what he learned over time in regard to these dealerships sold by Eagle's Nest. When Timberline first started, Eagle's Nest was charging $3,000 for a dealership, which was essentially the right to sell a panelized house. By the end, the price of a dealership had risen to $10,000. Goss stated that Eagle's Nest would have three to four hundred dealers, whom they called reps, who made $8,000 to $10,000 a year in nonrefundable deposits. The person only had three to four months time from the date of deposit to have the house shipped. Because it was almost impossible for these dealers, for whom there was no required specialized training, to make the necessary preparations for delivery, which included obtaining financing, finding land, choosing the

berline at all, as American Accent was contributing to Timberline's profitability and Goss did not want to lose that business, but Straight insisted and Goss wanted to accommodate Straight. Goss agreed to proceed with the lawsuit as long as he received an equal distribution. Because Timberline risked losing its status as an S corporation if any unequal distributions were made, Straight agreed that Goss and Pam would receive an equal amount in distribution as were incurred in American Accent legal fees by Timberline. Accordingly, upon Straight's suggestion that compensation could be made to a consulting company, and after receiving advice from an accountant and an attorney on the matter, Goss used Allied as the vehicle to handle the offsetting distributions. Minutes from a July 1993 board meeting reflect that Timberline had been asked by Straight to join in the American Accent lawsuit because Straight believed American Accent was competing unfairly with Eagle's Nest. According to the minutes, the board approved the action and further approved Goss receiving "compensation distributions equal to the legal fees incurred in this legal matter." A memo from Timberline's attorney in the American Accent litigation indicates Timberline had incurred legal fees of $184,416.92 related to that lawsuit.

Goss also testified that in 1992, Straight wanted to take distributions from Timberline in the form of a two and a half percent "special discount," to be received on top of the eight percent volume rebate Eagle's Nest was receiving from Timberline. According to Goss, this was during a time Straight was arguing with Gandolfi, and Straight was seeking a way to receive the money from Timberline without Gandolfi benefiting. Accordingly, Straight came up with the idea of this

---

style of home, and putting in a foundation, only fifty to seventy-five of these reps would actually take a home. The remainder would lose their deposits, which became nonrefundable revenue for Eagle's Nest. Goss testified to a particular meeting he attended with some of the potential reps wherein he began to explain what needed to be taken care of before a house arrived. He was interrupted by an Eagle's Nest employee who told the attendees their only responsibility was "to bring coffee and donuts." When Goss confronted Straight about selling such a complicated product to people and indicating there was such little work involved, Straight informed him that he was not in the business of selling panelized houses, but was in the "business of business," and he did not care if Eagle's Nest ever sold a house.

discount, and agreed that Goss would take out a like amount. Timberline's board meeting minutes from February 1991 reflect that Eagle's Nest requested a special two and a half percent discount, and that the board approved the request, noting "a like dollar amount ... will also be granted to Mr. Goss." Again, Allied was used as the distribution vehicle for the Gosses.

While Straight asserts on appeal that the evidence shows Goss's testimony was wholly unreliable, a thorough review of the entire record convinces us otherwise. Implicit within the referee's order is that the referee found Goss was credible and Straight was not. Though the actions of the Gosses may appear inappropriate at first blush, an understanding of the workings between the parties and their various businesses gives credence to Goss's testimony regarding the reasons behind the actions he and his wife took.

Goss testified at length to Straight's actions that required the various reactions by Goss. For instance, although Straight acknowledged in the letter of intent that he and Gandolfi were to contribute half of the initial capital investment, the two provided only $25,000 in a questionable transaction from Eagle's Nest, only provided a short term loan to the company in order to satisfy the bank in regard to their investment in the company, and refused to co-sign or guarantee any loans. This placed Goss and Pam in the position of having to personally guarantee Timberline's loans and letters of credit alone, taking on all of the risk of the company. At the same time, Straight made clear to Goss that he had no intention of ever guaranteeing any loans or investing any more money in Timberline. Goss also testified that Straight consistently insisted that Timberline's profits be distributed, thereby leaving no retained earnings in the business with which to invest in assets or other lines of business. Goss further testified that Straight insisted that Timberline bring a legal action against American Accent, Timberline's only other customer of any significance, even though only Straight and Eagle's Nest stood to gain from such an action, and Timberline would only lose this additional business. Additionally, Goss related that although the parties had agreed from inception that they would follow the Kingsberry pricing model in setting the prices Timberline would charge for the panelized houses, Straight fought Goss on each

price increase mandated by the increased price of materials for Timberline, and Straight refused to pay based on that pricing model as originally agreed. According to Goss, Straight called him in 1997 and told Goss he was not going to worry about Timberline anymore, essentially washing his hands of Timberline. The record shows that while neither Straight nor the Gosses held a majority of the shares in Timberline, Straight owned fifty percent of the business and was the sole customer for the times most pertinent to this litigation. As such, Straight held a certain control over Goss and Timberline, and constantly threatened to remove Eagle's Nest's business if Goss failed to comply with his requests. In fact, Straight's own expert, Professor John Freeman, testified that in his judgment, Straight was a "co-control shareholder." When asked if such a shareholder, who is "also the ninety-five percent customer" of a corporation could be guilty of corporate oppression if he threatens to take the business away from the corporation, he responded that if the business is being threatened by a controlling party causing the business to suffer, that could be a form of corporate oppression.

Aside from this support of the record, Goss also presented evidence from two independent witnesses as to his credibility. Reed Fickling, an employee of an insurance agency, testified he provided insurance for Timberline and Goss, and Goss was not his friend, but simply a client. Fickling testified that from his experience with Goss, Goss "was totally truthful and totally honest" and he would trust him implicitly. Willie Garvin, an accountant who provided services to Timberline until it ceased operations, testified Goss had "a very strong" reputation in the Greenwood business community, and he had heard someone comment that Goss "was as honest a person as they had ever met." Garvin stated he found Goss to be "straightforward and responsive" in answering questions in regard to the business.

While the record shows Goss enjoyed a reputation of honesty in the business community, no such evidence was submitted by Straight. On the other hand, counsel for the Gosses successfully impeached Straight's testimony before the referee. Contrary to Goss's testimony, Straight stated he wanted Timberline to be successful and never told Goss he was washing his hands of Timberline. He further denied planning

to remove Eagle's Nest's business from Timberline. However, when confronted, Straight acknowledged he wrote a letter to Gandolfi in 1991, which indicated plans to cease doing business with Timberline. In the letter, Straight proposed he give Gandolfi his shares in American Accent in exchange for Gandolfi's stock in Timberline, and as inducement for the agreement stated the deal would be more than fair to Gandolfi, as Eagle's Nest was "planning on ceasing doing business with Timberline to open its own plant to increase profits." Additionally, Goss maintained that Straight called him in 1997 and implied he was going "to go out and do something different." Straight admitted he faxed a document to Goss dated January 14, 1997, which was a proposal for the licensing of a new panelized house manufacturing facility located in a Native American community. Implicit within this document was a threat by Straight to take Eagle's Nest business away from Timberline.

Based on the foregoing, we find the evidence supports Goss's assertions that the legal fees and special discounts were provided for the benefit of Straight and the parties agreed that these monies would be considered distributions to Straight, for which the Gosses would receive the equivalent through payments made to Allied. Accordingly, we find no error in the referee's determination in this regard.

## Offset of Attorney's Fees and Special Discounts

Straight next contends the special referee erred in offsetting the attorney's fees and special discounts against the Allied disbursements, essentially performing an accounting, because there was no claim upon which to base the offset. He argues the referee went beyond the scope of the pleadings in awarding such relief, and even if a counterclaim or third party claim had requested the relief, such claims would be barred by the statute of limitations. We disagree.

A reading of the order shows the special referee did not perform an accounting as asserted by Straight. Nor did he address, nor rely on, any counterclaim or third party claim of respondents as the basis for his decision regarding treatment of the payments to Allied. Rather, the referee considered Straight's claim that the Gosses wrongfully caused Timberline to distribute funds to themselves through Allied and the

Gosses' defense that these payments were proper inasmuch as they were actually shareholder distributions paid to equalize distributions made to Straight in the form of attorney's fees and special discounts. The referee found that Allied provided the means to level the distribution of money to Timberline shareholders, with offsetting distributions to Straight through the attorney's fees and special discounts and to the Gosses through disbursements to Allied, and that these were essentially distributions of profits to shareholders. Because the assertions regarding the attorney's fees and special discounts were the Gosses' defense to Straight's claims of wrongful payments through Allied, we find no merit to his argument.

## Unclean Hands

Straight also contends the special referee erred in using the doctrine of unclean hands to "support the offset of attorney's fee and special discounts or for any other purpose." He argues the doctrine does not apply to conflict of interest transactions, as the test is whether the plaintiff is untainted with regard to the particular transaction of which he complains, and in order for a plaintiff to be precluded from recovering in equity under this doctrine, he must have acted unfairly in a matter that is the subject of the litigation. He maintains Timberline is the real party in interest and is the victim of the Gosses' wrongdoing, and Timberline could not have participated in the wrongdoing.[10] We disagree.

 "When this court is sitting in equity, and thus viewing evidence for its preponderance, we are to consider the equities of both sides, balancing the two to determine what, if any, relief to give." *Anderson v. Buonforte,* 365 S.C. 482, 493, 617 S.E.2d 750, 755 (Ct.App.2005). "The doctrine of unclean hands precludes a plaintiff from recovering in equity if he acted unfairly in a matter that is the subject of the litigation to the prejudice of the defendant." *First Union Nat'l Bank of S.C. v. Soden,* 333 S.C. 554, 568, 511 S.E.2d 372, 379 (Ct.App.

---

**10.** Straight summarily asserts Timberline is the real party in interest. However, in his order the special referee noted from the outset, although this action is ostensibly for the benefit of Timberline, as a practical matter the only beneficiary of the lawsuit would be the only shareholder who is not an officer or director, Straight. Straight does not challenge this finding.

1998). " 'He who comes into equity must come with clean hands. It is far more than a mere banality. It is a self-imposed ordinance that closes the door of the court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.' " *Emery v. Smith*, 361 S.C. 207, 220, 603 S.E.2d 598, 605 (Ct.App.2004) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)). "The decision to grant equitable relief is in the discretion of the trial judge." *Soden*, 333 S.C. at 568, 511 S.E.2d at 379.

■ Contrary to Straight's assertion, the equitable defense of unclean hands is available in a shareholder derivative action. *See Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3rd Cir.1959) (stating "even in a stockholders' derivative action 'unclean hands' on the part of a plaintiff will require dismissal of the action"); *Rosenfeld v. Zimmer*, 116 Cal.App.2d 719, 254 P.2d 137, 139 (1953) (holding the doctrine of unclean hands is applicable in a stockholders' derivative action); *Forkin v. Cole*, 192 Ill.App.3d 409, 139 Ill.Dec. 410, 548 N.E.2d 795, 805 (1989) (holding shareholder's derivative actions are inventions of courts of equity, and even though a party may merely be a nominal plaintiff bringing suit on behalf of a corporation, equity requires that a shareholder derivative action cannot be maintained if the nominal plaintiff has unclean hands in connection with the transactions which are the bases for the litigation or has participated or acquiesced in, or benefited from the conduct of which he now complains); *Suter v. Mazyck*, 226 S.W.3d 837, 843 (Ky.Ct.App.2007) (noting defense of unclean hands applies specifically to a stockholder's derivative action and the plaintiffs must have not engaged in conduct which would forfeit their right to seek equitable relief for the malfeasance of the corporate directors, officers, or majority shareholders); *Tierno v. Puglisi*, 279 A.D.2d 836, 719 N.Y.S.2d 350, 353 (N.Y.App.Div.2001) (holding that in order to establish the defense of unclean hands to a stockholder's derivative action, the evidence must demonstrate that the plaintiff's conduct was immoral or unconscionable, that the conduct of the plaintiff was directly related to the subject matter in litigation and that the party asserting the doctrine of unclean hands was thereby injured); *Becker v. Becker*, 66 Wis.2d 731, 225 N.W.2d 884, 885 (1975) (holding in a derivative

action the equitable defense of unclean hands is available against a plaintiff shareholder for the purpose of defeating his derivative suit because a "plaintiff who is subject to an equitable defense should not be able to avoid that defense by bringing suit in a representative capacity").

Straight does not challenge on appeal the specific findings of the referee that his conscious harassment of the Gosses constitutes unclean hands, or that he came into court with unclean hands in that the following actions by Straight were unfair and inequitable: (1) putting himself in conflict of interest by being a dominant shareholder in Timberline while controlling its major customer, (2) causing Timberline to sue its only other customer, (3) subordinating the interests of Timberline to those of Eagle's Nest, (4) setting an eight percent volume rebate when Timberline's sales to Eagle's Nest were below break-even, (5) surreptitiously recording telephone calls with Goss, (6) looting Timberline's assets, specifically the manufacturing design plans for the round house, and (7) threatening to move Eagle's Nest business to another builder after causing Timberline to lose its only other customer and thereafter conspiring and attempting to open Eagle's Nest's own manufacturing facility. *See ML–Lee Acquisition Fund, L.P. v. Deloitte & Touche,* 327 S.C. 238, 241, 489 S.E.2d 470, 472 (1997) (holding that an unappealed ruling is the law of the case).

Furthermore, Straight's own inequitable conduct came directly to bear on the transactions of which Straight now complains. Straight refused to contribute his time or money to Timberline while damaging the corporation's financial position by subordinating the interests of Timberline to those of Eagle's Nest. These actions left Timberline in no condition to either purchase the Wickes property or form a truss company. They also left the Gosses struggling to maintain Timberline through their own contributions of time and financial resources and resulted in their making the salary overrides and Allied distributions. Accordingly, we find the special referee did not err in holding the doctrine of unclean hands precluded Straight from recovering against the Gosses.

## Common Paymaster Doctrine

Straight next argues the special referee erred in using the common paymaster doctrine in regard to the payment by Timberline of CBT employees. Straight asserts such a doctrine does not apply here because the two companies were not commonly owned, but simply had "interlocking ownership and directors." We disagree.

A reading of the special referee's order shows he did not rely on a common paymaster doctrine. Rather, the referee simply noted that Timberline and CBT essentially engaged in a "common paymaster scheme" for the payment of labor, which is not an uncommon approach with related companies. The referee did not make any findings whether the common paymaster doctrine would apply in a situation where some, but not all, of the shareholders have two companies in common. Further, there is evidence of record that use of one payroll account for two companies may have cost-saving benefits and is an appropriate practice. Most importantly, there is evidence to support the referee's finding that the funds paid by Timberline for CBT labor were offset by the trusses CBT provided for Timberline, that the accounts were reconciled at the end of each year, and that at the end of 2000, Timberline actually owed CBT over $14,000. Accordingly, there was clearly no harm to Timberline in the employment of a common paymaster scheme under the circumstances.

## Misappropriation of Corporate Opportunities

Finally, Straight argues the acquisition of the Wickes property and formation of CBT were corporate opportunities for Timberline which the Gosses misappropriated for themselves. He asserts the special referee improperly relied on his conclusion that Timberline was financially incapable of taking advantage of the opportunities presented because Timberline would have had the funds available had the Gosses not removed them through the improper Allied and salary override payments. He further maintains CBT used Timberline to "bankroll" itself, and used Timberline employees, material and rent to nourish CBT. He thus contends the use of Timberline assets during a decline in business, along with the monies removed by the Gosses, resulted in the demise of Timberline

but the success and survival of CBT, which ultimately evolved into Structural Component Systems. Accordingly, Straight claims the Gosses should be ordered to return Structural Component Systems and the Wickes property to Timberline, or the court should impose a constructive trust in favor of Timberline on these assets. We disagree.

"A constructive trust results 'when circumstances under which property was acquired make it inequitable that it be retained by the one holding legal title. These circumstances include fraud, bad faith, abuse of confidence, or violation of a fiduciary duty which gives rise to an obligation in equity to make restitution.'" *Macaulay v. Wachovia Bank of S.C., N.A.,* 351 S.C. 287, 294, 569 S.E.2d 371, 375 (Ct.App. 2002) (quoting *Hendrix v. Hendrix,* 299 S.C. 233, 235, 383 S.E.2d 468, 469 (Ct.App.1989)). "A constructive trust 'arises entirely by operation of law without reference to any actual or supposed intentions of creating a trust.'" *Smith v. S.C. Ret. Sys.,* 336 S.C. 505, 529, 520 S.E.2d 339, 352 (Ct.App.1999) (quoting *McNair v. Rainsford,* 330 S.C. 332, 356, 499 S.E.2d 488, 501 (Ct.App.1998)).

In general, a constructive trust may be imposed when a party obtains a benefit "which does not equitably belong to him and which he cannot in good conscience retain or withhold from another who is beneficially entitled to it as where money has been paid by accident, mistake of fact, or fraud, or has been acquired through a breach of trust or the violation of a fiduciary duty."

*Id.* (quoting *SSI Medical Servs., Inc. v. Cox,* 301 S.C. 493, 500, 392 S.E.2d 789, 793–94 (1990)).

As previously stated, the evidence of record supports the Gosses' actions when considered in conjunction with those of Straight. There is evidence Straight consistently insisted on the distribution of Timberline profits, insisted Timberline engage in an expensive lawsuit with Timberline's only other customer, refused to invest any further funds beyond his nominal initial investment and short term loan, refused to guarantee any loans, which would have been necessary for Timberline to purchase any property or begin its own truss business, and agreed Goss was to receive distributions through Allied to level out the benefits he received by way of the

American Accent legal fees and the special discounts. Further, the evidence suggests Straight was not concerned with Timberline's profit, but only that of Eagle's Nest, and that selling "dealerships" was much more profitable to Eagle's Nest than selling the panelized houses manufactured by Timberline. Thus, it is no surprise that the number of houses produced by Timberline for Eagle's Nest decreased dramatically over the years. This, along with Straight's constant battle with Goss over the Timberline price increases and his failure to follow the agreed upon pricing model, inevitably contributed to the severe financial problems and ultimate demise of Timberline. Additionally, the evidence is clear that Straight asserted control over Goss and Timberline by threatening to remove Eagle's Nest business. Further, the Gosses' personal venture into real estate provided Timberline with the manufacturing facility necessary for its survival when it could no longer stay on the previously leased premises nor locate another available and appropriate space and did not have the financial capability to purchase its own facility. As well, Timberline did not have the financial means to begin its own truss business, yet benefited from the arrangement with CBT, obtaining faster custom quotes and delivery, cheaper prices, and free delivery.

Reviewing the evidence in accordance with our own view of the preponderance of the evidence, we agree with the referee that there was no misappropriation of corporate opportunities of Timberline by the Gosses, and to invoke a constructive trust as requested by Straight is entirely inappropriate under the circumstances presented.

## CONCLUSION

For the foregoing reasons, the special referee's order is

**AFFIRMED.**

WILLIAMS and KONDUROS, JJ., concur.