770 S.E.2d 405

**Joseph E. MASON, Jr., Appellant,**

v.

**Catherine L. MASON, Joseph E. Mason, Sr., Kathy St. Blanchard, Mason Holding Company, Inc., and Irwin Levine, Respondents.**

**Appellate Case No. 2012–212146.**
**No. 5300.**

Court of Appeals of South Carolina.

Heard Sept. 8, 2014.

Decided March 4, 2015.

Rehearing Denied April 24, 2015.

32

36

Robert Yates Knowlton, Sr. and Elizabeth Halligan Black, both of Haynsworth Sinkler Boyd, PA, of Columbia, for Appellant.

John M. Leiter, of Law Offices of John M. Leiter, PA, of Myrtle Beach, for Respondent Irwin Levine; Emma Ruth Brittain and J. Jackson Thomas, both of Thomas & Brittain, P.A., of Myrtle Beach, for Respondents Joseph E. Mason, Sr., Catherine L. Mason, Kathy St. Blanchard, and Mason Holding Company, Inc.

KONDUROS, J.

In this shareholder dispute case, Joseph E. Mason, Jr. (Son) appeals the special referee's decision granting judgment on his causes of action including breach of contract, breach of fiduciary duty, wrongful termination, and civil conspiracy in favor of Catherine L. Mason (Mother), Joseph E. Mason, Sr. (Father), Kathy St. Blanchard (Daughter) (collectively, the Masons),

Mason Holding Company, Inc. (the Company), and Irwin Levine (Accountant) (collectively, Respondents). He also asserts the special referee erred in not ordering the repurchase of his shares of the Company. He further contends the special referee erred in finding for the Masons and the Company on their counterclaims. We affirm.

## FACTS/PROCEDURAL HISTORY

The Company operates five tire and auto service stores in Horry and Georgetown Counties. It is a statutory close corporation without a board of directors. For many years, Father had operated eight retail stores for Goodyear Tire & Rubber Company and was a partner in a truck tire center in Miami, Florida, where he and Mother resided. In 1984, Father decided to start a tire and auto service business in the greater Myrtle Beach area. Son and Daughter wanted to be involved, and each contributed $10,000 for a ten percent interest in return. Son graduated from the University of Alabama with a degree in business administration and started working for Ryder Truck Rental in Florida in 1983. After the location was acquired for the first store, Son moved to Surfside Beach to open the first store and be the store manager. Daughter and her husband, Oswald St. Blanchard (Ozzie), also moved to the area to work at the store. Daughter did bookkeeping and sales. Mother and Father moved to the area in 1989 to work on expanding the business into commercial accounts. Around 1989, Accountant started working for the Company as its accountant. He had previously worked for Mother as an accountant in Florida. Accountant was not a certified public accountant, a CPA, but was a PA, a public accountant. He lived in Florida and did not have a license to practice accountancy in South Carolina. He had prepared the Company's tax returns since 1989 and also served as family members' personal accountant.

In 1989, the family opened a store in North Myrtle Beach. In 1995, they opened a store in Pawleys Island. In 1998, the Company was formed and ownership of the individual stores was transferred to the Company. At that time, Father owned 520 shares, Mother owned 160, Son owned 160, Daughter owned 90, and Ozzie owned 70. In 1999, the Company opened an additional store in Myrtle Beach. The buildings and land where the Company's stores were located were owned by

separate entities owned by members of the Company. By 2001, Son was president of the Company.

On December 18, 2004, Ozzie was severely injured in a motorcycle accident and as a result became a quadriplegic. The accident occurred on a Saturday while Ozzie was riding in a Toys for Tots ride. Ozzie was wearing his uniform and had represented the Company in this capacity before. Ozzie had appeared in commercials for the Company and was "the face" of the Company. Son believed Ozzie was not entitled to workers' compensation because he was not at work when the accident occurred and his claim would increase the Company's insurance premiums. The matter was litigated, and the single commissioner of the Workers' Compensation Commission determined Ozzie was acting within the course and scope of his employment when the accident occurred and found the claim compensable. The Appellate Panel reversed the single commissioner in a two to one decision. The matter was appealed to the circuit court, but before the circuit court reached a decision, the parties settled the claim.

Son testified Father had told him they needed to make sure Ozzie got workers' compensation benefits for the accident. Son believed Father was asking him to perjure himself and indicated he told Father he could not do that. Son felt the disagreement was the turning point in his relationship with the rest of the family. Father testified he did not ask Son to lie and Son only worried about it costing the Company a lot of money. Father believed Ozzie was working in the course and scope of employment. Father indicated Ozzie was not working at one of their stores that day but he was working for the company by appearing at the Toys for Tots event. The minutes from a stockholder meeting of the Company following the accident as well as Father's deposition during the workers' compensation proceeding state Father and other employees saw Ozzie at one of the stores on the day of the accident while he was picking up business cards and coupons. The special referee found Son's testimony on this matter to be uncredible.

Mother and Father began thinking about retirement and developed a retirement plan. Initially, they planned for Son and Daughter to purchase Mother's and Father's shares. However, the parties decided for tax purposes Mother and

Father would incrementally give Son and Daughter shares in the Company with Son and Daughter each owning half the shares by December 31, 2011. Also as part of the retirement plan, on January 1, 2003, an LLC owned by Mother and Father, which owned the property for one of the store's locations, executed a lease with the Company for $90,000 annually for a term of nineteen years. The lease was only for the building because a prior lease agreement was in effect for the land. Additionally, on December 31, 2002, Mother, Father, Daughter, and Son entered into an employment contract lasting until December 31, 2022, to pay Mother and Father a total of $10,400 per year as well as benefits including health insurance, a gasoline credit card, and a company car. Accountant testified they were trying to minimize the impact on social security income and self-employment taxes. Father testified the second lease was created in order to pay Father the same amount he had been receiving previously though salary. In 2003, Mother and Father began receiving the payments from the employment contract and through their LLC under the lease. By 2007, in keeping with the retirement plan, Son and Daughter each had a 30% share of stock in the Company. Father testified he stopped giving his and Mother's shares in the Company to Son when Son brought this lawsuit.

In 2006, Son wanted to open an additional location. He and a friend along with Daughter owned the store, called Mason Tire & Auto Service, through an entity called BCJ Tires, LLC. The Company owned the property and building and leased it to BCJ Tires. The Company had no ownership interest in BCJ Tires. On August 3, 2007, Son transferred $93,500 from the Company to BCJ Tires without Mother or Father's knowledge. When Father learned about the money, he had Son and Daughter transfer their interests in BCJ Tires to the Company. Accountant later acquired Son's friend's shares and some of the Company's shares, resulting Accountant owning a majority interest in BCJ Tires. The store operates at a loss.

An employee for the Company testified that at times, Son did not come to work and gave no explanation. Father testified Son had been absent from the business several times and no one knew where he was. Daughter also testified Son

would sometimes "walk off the job" but he was always allowed to return. Father indicated he convened an emergency shareholder meeting because of Son's unexplained absences. Son testified he had sometimes worked from home but always had been in touch with the Company and never had stopped running the Company.

On August 18, 2007, Son offered to purchase all but 5% of Daughter's 25% interest in the Company for $625,000 or to sell 25% of his interest in the Company for $987,500. He testified they had numerous discussions about different options of shareholders being bought out because they were not getting along. He testified he offered Daughter $1 million for her shares, but she turned it down. Son then requested Father buy his shares, but Father turned him down. Son indicated Father told him if he was unhappy he could quit. Daughter also offered Son $1 million for his shares, but according to Son, the offer later "evaporated."

On August 31, 2007, attorney Wayne Byrd sent a letter to the Masons advising them he had been retained by Son to represent his interests as an officer, director, and minority shareholder in the Company. On September 17, 2007, following a meeting with the parties, Byrd sent a letter to the Masons' attorney ordering them to stop paying for the members' personal expenses, reduce Daughter's salary, and terminate Ozzie. Byrd also sent a letter to Accountant indicating he had learned of "various serious financial and tax accounting irregularities which [he] ha[d] devised and fashioned." All of the shareholders except Son signed an agreement to repay the Company for personal expenses. Son testified he refused to sign it because previously, all the shareholders had approved those expenses. On September 28, 2007, Byrd's law firm refunded the Company for the Company's check Son had used to pay his fee because it was representing him individually. However, Son then transferred to himself from the Company the amount he owed Byrd, $17,301.66.

On October 24, 2007, a shareholders meeting was held, and Father was elected president and Son was elected vice president. Son was no longer in charge of the financial aspects of the Company but his salary and other responsibilities remained the same. Son continued working until July 2008.

On December 7, 2007, the Company held a shareholders meeting to sign the amended tax returns. Accountant testified Son insisted the amended tax returns not be filed and the Masons went along with it despite their unhappiness about it. Father testified that at the meeting Son stated that if they would not file those amended tax returns and instead handled it another way, he would stay with the Company and Father agreed. Son testified that at the meeting, the Masons were screaming at him and he said the Company should do whatever was necessary to fix the tax returns. Son testified Accountant stated the Company could fix the returns by doing something else with the revenue instead of amending the returns. Son testified he knew of the amended tax returns but did not see them before he brought the lawsuit.

In December 2007, Son told Father that Steve Allison offered to buy the Company for $3 million. Father testified he did not consider it a serious offer because he did not believe Allison knew any details about the Company. Father indicated he called Allison and informed him he was not interested in selling the Company at that time. Allison testified he was president of a company that owned car oil change shops and in December 2007 he was interested in buying the Company based on his observations of the Company over thirteen years. Allison offered $3 million because Son believed from prior conversations with Father he would accept that amount.

Sandra Adams worked as a bookkeeper for the Company. In July 2008, Son determined from some discrepancies in the monthly payments for an insurance policy Adams was stealing from the Company and informed Father and Daughter he was going to fire her. Father testified he and Daughter expressed concern that Son not fire her right away due to the workload it would place on Daughter until Adams could be replaced. Son stated that he was going to do the firing immediately, and Father said he would support him. Son fired Adams, but Father decided to rehire Adams because he thought they needed to look into the matter further. Father indicated that when he told Son, Son said, "I'll bury you." Father rehired Adams and put her on probation. He testified it was unproven whether Adams was stealing and she was still employed by the Company. The special referee found Father's testimony

on the matter credible and determined Father's "actions were consistent with the Company's best interest and the decision was a valid business judgment."

On August 5, 2008, Son filed a complaint against the Masons and the Company, asserting causes of action for breach of contract, breach of fiduciary duty, civil conspiracy, relief pursuant to sections 33–14–300 to –330 of the South Carolina Code [1], wrongful termination of employment-constructive discharge, and wrongful termination-violation of public policy. On September 23, 2009, Son filed an amended complaint adding Accountant as a defendant and adding a cause of action against him for aiding and abetting breach of fiduciary duty. The Masons and the Company filed an answer asserting affirmative defenses and counterclaims against Son for breach of fiduciary duty and conversion.[2] The parties consented to the case being referred to the special referee. The special referee conducted a five-day trial on the case.

The conversion counterclaim was based on an alleged casing[3] scheme. Son testified he would fabricate the name of a company, write a receipt for truck tires from that company, and take cash out of the drawer in that amount. He indicated he would later split that money with Daughter. He testified Accountant told him this was acceptable as long as he split the money with Daughter. Accountant testified he did not tell Son how to create fictitious invoices. An employee of the Company testified that between 2003 and 2007 he had noticed cash missing from the drawer and an invoice for casings but there were no casings. He testified he noticed Son taking money out of the cash drawer and would see the invoice audit at the end of the day.

In 2003 and 2006, Son made adjustments to the records for the Company that increased the inventory and created a corresponding credit note payable to Son and Daughter. The note for 2003 was $440,000 and for 2006 it was $300,000. Son

---

1. Under this cause of action, Son requested the court order a purchase of his shares in the Company at fair value.

2. Accountant filed a separate answer.

3. A casing is a used commercial tire that has the capability of being recapped for sale.

and Ozzie signed the 2003 note and it was witnessed by Mother and Father. Daughter did not sign either note and testified she did not know about the notes until Son asked her in 2007 to sign two promissory notes and she refused. Son indicated the family all knew about the inventory adjustments and it was Accountant's idea to decrease the Company's tax liability. Accountant testified he told Son about both the proper way to fix the inventory problem and the way he ultimately handled it. Accountant testified Son decided to make the 2003 adjustment in order to decrease the Company's tax liability. Accountant testified that at the time, only Son and himself knew about the 2003 adjustment and Accountant did not know about the 2006 adjustment until after Son had made it. Son testified he had relied on Accountant's advice that the adjustments were proper and he did not know about the "severity" of the adjustments until Byrd informed him. Laura Durant, a CPA retained by the Masons and the Company for trial, testified the adjustments had no basis in reality and had a significant effect on the income tax returns. Son testified he signed the tax returns from 1984 until 2007, specifically in 2003 and 2006. Son testified he did not know the tax returns were fraudulent because he relied on Accountant and he did not think the Masons knew the returns were fraudulent until 2007. Accountant testified he did not tell the Masons the tax returns were fraudulent. He testified he accepted the way Son had handled the excess inventory and filed the tax returns because of his close relationship with the family. The special referee found Accountant's testimony regarding making inventory adjustments and creating fictitious notes substantially more credible than Son's despite the fact that his filing of the tax returns was professionally inappropriate.

David Timothy Duncan, an accountant hired by the Company, testified he was involved with reviewing amended tax returns for the Company in 2007. He decided to not file the amended returns and returned them to Accountant. Duncan testified that while he was considering the amended returns, Son talked to him about inventory adjustments and Duncan advised him against it.

Son testified no one fired him, told him not to come back, or cut his pay. He found working at the Company intolerable

and thought the other shareholders wanted him to quit. He stated that although the Company did not reduce his pay or benefits, the Masons embarrassed him in front of other employees.

The special referee found for Respondents on all of Son's causes of action.[4] The special referee found "it is beyond dispute in my opinion that Son was aware of and actively engaged in and furthered the very practices about which his attorney['s] September 17, 2007 letter complains and which form the basis of some of the claims in this action." The special referee also determined nothing in the record indicated the Masons deviated from the appropriate standard of conduct. The special referee determined nothing indicated the Masons' conduct towards Son was oppressive or unfairly prejudicial and they had not breached their fiduciary duty. The referee further found because Son presented no evidence of a breach by the Masons, his claim for his shares to be repurchased must fail. He found,

> Son's dissatisfaction with his lack of employment by [the] Company, as well as with diminution of the value of his shares due to significant tax liability and the unfortunate business decision to expand the Company's operation ... are matters that were principally due to and occasioned by the conduct and decisions of Son.

He noted that Son's request for his shares to be purchased was an equitable one and Son's unclean hands from his conduct prevented him from relying on an action for stockholder oppression or breach of fiduciary duty.

The special referee found "[t]he inaccuracies in the tax returns and any damages that flow from these falsities would affect the corporation in its entirety, not Son specifically. Therefore, Son's suit was improper in that it was not filed as a derivative action." The special referee also stated, "Contrary to the holding in *Brown v. Stewart* [[5]], Son has sued ...

---

4. The special referee issued one order for the actions regarding the Masons and the Company and another for the action against Accountant.

5. *Brown v. Stewart,* 348 S.C. 33, 49, 557 S.E.2d 676, 684–85 (Ct.App. 2001) ("If misconduct by the management of a corporation has caused a particular loss to an individual stockholder, the liability for the

Father, Mother[,] and [Daughter] under [sections 33–8–300 and –420 of the South Carolina Code (2006) ]."

The special referee found for the Masons and the Company on their counterclaims for conversion regarding the casings scheme and Son's payment of his attorney's fees and awarded them $11,716.32 and $17,301.66 respectively. The special referee determined the cause of action for damages arising from the filing of false tax returns was not ripe for adjudication because the amount of damages was undetermined at the time.

Son filed a Rule 59(e), SCRCP, motion, requesting the special referee delete or clarify the portion of the order relating to the counterclaim regarding the tax obligations. The special referee denied the motion. This appeal followed.

**STANDARD OF REVIEW[6]**

"[A]n appellate court must look to the main purpose of the proceeding in order to determine the standard of review to exact." *Wheeler v. Estate of Green*, 381 S.C. 548, 554, 673 S.E.2d 836, 839–40 (Ct.App.2009). "The character of the action is generally ascertained from the body of the complaint, but when necessary, resort may also be had to the prayer for relief and any other facts and circumstances which throw light upon the main purpose of the action." *Sloan v. Greenville Cnty.*, 380 S.C. 528, 534, 670 S.E.2d 663, 666–67 (Ct.App.2009). "When legal and equitable actions are maintained in one suit, the court is presented with a divided scope of review, and each action retains its own identity as legal or equitable for pur-

---

mismanagement is an asset of the individual stockholder. Of course, a suit based on the misconduct can be brought by the individual stockholder. It becomes material, therefore, to inquire whether the acts of mismanagement charged to the directors affected the plaintiffs *directly*, or as their interests were submerged in the corporation whose assets were thus dissipated." (citation and internal quotations marks omitted)).

**6.** Son urges this court to use caution in applying the standard of review because the orders from which this appeal is taken were prepared by Respondents. *See In re Luhr Bros.*, 157 F.3d 333, 338 (5th Cir.1998) ("[I]n cases such as the instant one, where the district court's Findings of Fact and Conclusions of Law are near-verbatim recitals of the prevailing party's proposed findings and conclusions, with minimal revision, we should approach such findings with 'caution.' ").

poses of review on appeal." *Wright v. Craft*, 372 S.C. 1, 17, 640 S.E.2d 486, 495 (Ct.App.2006). "The proper analysis is to view the actions separately for the purpose of determining the appropriate standard of review." *Id.* at 17–18, 640 S.E.2d at 495.

## LAW/ANALYSIS

## I. Judicial Dissolution/Repurchase of Shares

Son argues the special referee erred in denying him relief under the judicial dissolution provisions governing South Carolina corporations. He asserts the special referee should have ordered a buyout of his shares. We disagree.

▮▮▮ "Under the two[-]issue rule, whe[n] a decision is based on more than one ground, the appellate court will affirm unless the appellant appeals all grounds because the unappealed ground will become the law of the case." *Jones v. Lott*, 387 S.C. 339, 346, 692 S.E.2d 900, 903 (2010).

It should be noted that although cases generally have discussed the two[-]issue rule in the context of the appellate treatment of general jury verdicts, the rule is applicable under other circumstances on appeal, including affirmance of orders of trial courts. For example, if a court directs a verdict for a defendant on the basis of the defenses of statute of limitations and contributory negligence, the order would be affirmed under the two[-]issue rule if the plaintiff failed to appeal both grounds or if one of the grounds required affirmance.

*Id.* at 346, 692 S.E.2d at 904 (internal quotation marks omitted). "[A]n unappealed ruling, right or wrong, is the law of the case." *Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012).

▮▮▮ "A corporate dissolution is an action in equity." *Jordan v. Holt*, 362 S.C. 201, 205, 608 S.E.2d 129, 131 (2005). "A shareholders derivative action, as well as an action for stockholder oppression, is one in equity." *Ballard v. Roberson*, 399 S.C. 588, 593, 733 S.E.2d 107, 109 (2012) (internal quotation marks omitted). "In actions in equity referred to a special referee with finality, the appellate court may view the evidence to determine the facts in accordance with its own view of the preponderance of the evidence, though it is not required to disregard the findings of the special referee."

*Florence Cnty. Sch. Dist. # 2 v. Interkal, Inc.,* 348 S.C. 446, 450, 559 S.E.2d 866, 868 (Ct.App.2002); *see also First Union Nat'l Bank of S.C. v. Soden,* 333 S.C. 554, 567, 511 S.E.2d 372, 379 (Ct.App.1998) ("[W]e are not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility.").

■ Sections 33–18–400 to –430 of the South Carolina Code (2006) apply to close corporations.

(a) Subject to satisfying the conditions of subsections (c) and (d), a shareholder of a statutory close corporation may petition the circuit court for any of the relief described in [s]ection 33–18–410, 33–18–420, or 33–18–430 if:

(1) the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, fraudulent, or unfairly prejudicial to the petitioner, whether in his capacity as shareholder, director, or officer of the corporation;

. . . or

(3) there exist grounds for judicial dissolution of the corporation under [s]ection 33–14–300[ [7] ].

(b) A shareholder must commence a proceeding under subsection (a) in the circuit court of the county where the corporation's principal office or, if none in this State, its registered office is located. The jurisdiction of the court in which the proceeding is commenced is plenary and exclusive.

(c) If a shareholder has agreed in writing to pursue a nonjudicial remedy to resolve disputed matters, he may not commence a proceeding under this section with respect to the matters until he has exhausted the nonjudicial remedy.

S.C.Code Ann. § 33–18–400 (2006).

(a) If the court finds that any grounds for relief described in [s]ection 33–18–400(a) exist, it may order one or more of the following types of relief:

---

7. Those grounds include "(ii) the directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, fraudulent, oppressive, or unfairly prejudicial either to the corporation or to any shareholder (whether in his capacity as a shareholder, director, or officer of the corporation)" and "(iv) the corporate assets are being misapplied or wasted." S.C.Code Ann. § 33–14–300(2) (2006).

(1) the performance, prohibition, alteration, or setting aside of any action of the corporation or of its shareholders, directors, or officers of or any other party to the proceeding;

(2) the cancelation or alteration of any provision in the corporation's articles of incorporation or bylaws;

(3) the removal from office of any director or officer;

(4) the appointment of any individual as a director or officer;

(5) an accounting with respect to any matter in dispute;

(6) the appointment of a custodian to manage the business and affairs of the corporation;

(7) the appointment of a provisional director who has all the rights, powers, and duties of an elected director to serve for the term and under the conditions prescribed by the court;

(8) the payment of dividends;

(9) the award of damages to any aggrieved party.

(b) If the court finds that a party to the proceeding acted arbitrarily, vexatiously, or otherwise not in good faith, it may award other parties their reasonable expenses, including counsel fees and the expenses of appraisers or other experts, incurred in the proceeding.

S.C.Code Ann. § 33–18–410 (2006).

(a) If the court finds that the ordinary relief described in [s]ection 33–18–410(a) is or would be inadequate or inappropriate, it may order the corporation dissolved under [s]ection 33–18–430 unless the corporation or one or more of its shareholders purchase all the shares of the shareholder for their fair value and on terms determined under subsection (b).

(b) If the court orders a share purchase, it shall:

(1) determine the fair value of the shares, considering among other relevant evidence the going concern value of the corporation, any agreement among some or all of the shareholders fixing the price or specifying a formula for determining share value for any purpose, the recommendations of any appraisers appointed by the court, and any legal constraints on the corporation's ability to purchase the shares;

(2) specify the terms of the purchase, including, if appropriate, terms for installment payments, subordination of the purchase obligation to the rights of the corporation's other creditors, security for a deferred purchase price, and a covenant not to compete or other restriction on the seller;

(3) require the seller to deliver all his shares to the purchaser upon receipt of the purchase price or the first installment of the purchase price;

(4) provide that after the seller delivers his shares he has no further claim against the corporation, its directors, officers, or shareholders, other than a claim to any unpaid balance of the purchase price and a claim under any agreement with the corporation or the remaining shareholders that is not terminated by the court;

(5) provide that, if the purchase is not completed in accordance with the specified terms, the corporation is to be dissolved under [s]ection 33–18–430; and

(6) provide that the corporation or remaining shareholders release or enter into an agreement to indemnify the seller from any personal liability for obligations of the corporation the seller has personally guaranteed.

S.C.Code Ann. § 33–18–420 (2006).

(a) The court may dissolve the corporation if it finds:

(1) there are grounds for judicial dissolution under [s]ection 33–14–300; or

(2) all other relief ordered by the court under [s]ection 33–18–410 or 33–18–420 has failed to resolve the matters in dispute.

(b) In determining whether to dissolve the corporation, the court shall consider among other relevant evidence the financial condition of the corporation but may not refuse to dissolve solely because the corporation has accumulated earnings or current operating profits.

S.C.Code Ann. § 33–18–430 (2006).

In *Kiriakides v. Atlas Food Systems & Services, Inc.*, 343 S.C. 587, 541 S.E.2d 257 (2001), [the supreme court] established how a court should determine whether majority shareholders have acted oppressively within the meaning of section 33–14–300. . . . In establishing the proper consider-

ations for finding oppression, [the court] observed that the terms oppressive and unfairly prejudicial are elastic terms whose meaning varies with the circumstances presented in a particular case. [The court] also noted this was a fact-sensitive review and should therefore be determined through a case-by-case analysis, supplemented by various factors which may be indicative of oppressive behavior. Although [the court] declined to set out specific factors in *Kiriakides,* [it] observed several commonly considered ones including: eliminating minority shareholders from director-ate and excluding them from employment[,] ... failure to enforce contracts for the benefit of the corporation[, and] withholding information from minority shareholders.

*Ballard,* 399 S.C. at 594, 733 S.E.2d at 110 (second omission by court) (citations and internal quotation marks omitted).

In *Ballard,* the court noted that the minority shareholder, "like [the minority shareholders] in *Kiriakides,* similarly faces prospects of exclusion from the business, a slim chance of seeing a return any time soon, and no market in which to otherwise unload his investment." *Id.* at 595, 733 S.E.2d at 110. The court noted, "This result is especially significant because returns on investment in close corporations often accrue incident to employment with the corporation as op-posed to through dividends." *Id.* at 596–97, 733 S.E.2d at 111 (citing Douglas K. Moll, *Shareholder Oppression in Close Corporations: The Unanswered Question of Perspective,* 53 Vand. L.Rev. 749, 758 (Apr.2000) (noting that "the close corporation investor typically looks to salary rather than dividends for a share of the business returns because the (e)arnings of a close corporation often are distributed in major part in salaries, bonuses and retirement benefits" (internal quotation marks omitted))).

Common freeze out techniques include the termination of a minority shareholder's employment, the refusal to declare dividends, the removal of a minority shareholder from a position of management, and the siphoning off of corporate earnings through high compensation to the majority share-holder. Often, these tactics are used in combination. In a public corporation, the minority shareholder can escape such abuses by selling his shares; there is no such market, however, for the stock of a close corporation. The primary

vulnerability of a minority shareholder is the specter of being locked in, that is, having a perpetual investment in an entity without any expectation of ever receiving a return on that investment.

*Kiriakides*, 343 S.C. at 604–05, 541 S.E.2d at 267 (footnotes, citations, and internal quotation marks omitted).

"The application of these grounds for dissolution to specific circumstances obviously involves judicial discretion in the application of a general standard to concrete circumstances." *Id.* at 598, 541 S.E.2d at 263 (internal quotation marks omitted). "The court should be cautious in the application of these grounds so as to limit them to genuine abuse rather than instances of acceptable tactics in a power struggle for control of a corporation." *Id.* (internal quotation marks omitted).

Although the terms oppressive and unfairly prejudicial are not defined in section 33–14–300, the comment to [section] 33–18–400 [of the South Carolina Code] (1990), which allows shareholders in a statutory close corporation to petition for relief on the grounds of oppressive, fraudulent, or unfairly prejudicial conduct provides:

No attempt has been made to define oppression, fraud, or unfairly prejudicial conduct. These are elastic terms whose meaning varies with the circumstances presented in a particular case, and it is felt that existing case law provides sufficient guidelines for courts and litigants.

*Kiriakides*, 343 S.C. at 598, 541 S.E.2d at 263–64 (internal quotation marks omitted). "[I]llegal or fraudulent conduct is not required under section 33–14–300(2)(ii). . . . The concern and focus in shareholder oppression cases is that the minority faces a trapped investment and an indefinite exclusion [from] participation in business returns." *Ballard*, 399 S.C. at 595, 733 S.E.2d at 110 (last alteration by court) (internal quotation marks omitted). "Prior to 1963, dissolution could be based only upon illegal, fraudulent or oppressive conduct. In an attempt to afford minority shareholders greater protection, the legislature amended the statute in 1963 to include unfairly prejudicial conduct." *Kiriakides*, 343 S.C. at 597 n. 17, 541 S.E.2d at 263 n. 17 (internal quotation marks omitted). "The statute, as amended, broadens the scope of actionable conduct

by providing the frozen-out minority shareholder a right of action based on conduct by the majority shareholders which might not rise to the level of fraud." *Id.* (internal quotation marks omitted).

The *Kiriakides* court found:

> [W]e do not believe the Legislature intended a court to judicially order a corporate dissolution *solely* upon the basis that a party's reasonable expectations have been frustrated by majority shareholders. To examine the reasonable expectations of minority shareholders would require the courts of this state to microscopically examine the dealings of closely held family corporations, the intentions of majority and minority stockholders in forming the corporation and thereafter, the history of family dealings, and the like. We do not believe the Legislature, in enacting section 33–14–300, intended such judicial interference in the business philosophies and day to day operating practices of family businesses.

*Id.* at 599, 541 S.E.2d at 264 (internal quotation marks omitted).

> [S]ection 33–14–300 does not place the focus upon the rights or interests of the complaining shareholder but, rather, specifically places the focus upon the *actions* of the majority, i.e., whether they have acted, are acting, or will act in a manner that is illegal, fraudulent, oppressive, or unfairly prejudicial either to the corporation or to any shareholder. Given the language of our statute, a reasonable expectations approach is simply inconsistent with our statute.

*Kiriakides,* 343 S.C. at 600, 541 S.E.2d at 265 (internal quotation marks omitted).

 "When this court is sitting in equity, and thus viewing evidence for its preponderance, we are to consider the equities of both sides, balancing the two to determine what, if any, relief to give." *Anderson v. Buonforte,* 365 S.C. 482, 493, 617 S.E.2d 750, 755 (Ct.App.2005). "The doctrine of unclean hands precludes a plaintiff from recovering in equity if he acted unfairly in a matter that is the subject of the litigation to the prejudice of the defendant." *Soden,* 333 S.C. at 568, 511 S.E.2d at 379. "He who comes into equity must come with clean hands. It is far more than a mere banality. It is a self-

imposed ordinance that closes the door of the court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Emery v. Smith*, 361 S.C. 207, 220, 603 S.E.2d 598, 605 (Ct.App.2004) (internal quotation marks omitted). "The decision to grant equitable relief is in the discretion of the trial judge." *Soden*, 333 S.C. at 568, 511 S.E.2d at 379. "[T]he equitable defense of unclean hands is available in a shareholder derivative action." *Straight v. Goss*, 383 S.C. 180, 207, 678 S.E.2d 443, 458 (Ct.App.2009). In *Straight*, the court found the minority shareholder's "own inequitable conduct came directly to bear on the transactions of which [he] now complains." *Id.* at 208, 678 S.E.2d at 458. The court found "the special referee did not err in holding the doctrine of unclean hands precluded [the minority shareholder] from recovering against the [majority shareholders]." *Id.*

In this case, the special referee ruled that Son's suit was improper because it should have been filed as a derivative action.[8] The special referee's conclusions of law 6, 7, and 8 all relate to this determination. The special referee does not specify to which causes of action this decision applies. The referee does specifically state "[t]he inaccuracies in the tax returns and any damages that flow from these falsities would affect the corporation in its entirety, not ... Son specifically. Therefore, Son's suit was improper in that it was not filed as a derivative action." Son does not address the special referee's finding his suit should have been filed as a derivative action. Therefore, this ruling is the law of the case under the two-issue rule.

As to the merits, this court can make its own findings of fact while keeping in mind the special referee saw and heard the witnesses' testimonies. Based on the evidence in

8. Generally, suits to recover assets of the corporation must be brought as derivative actions. *See Brown v. Stewart*, 348 S.C. 33, 49, 557 S.E.2d 676, 684 (Ct.App.2001). An individual shareholder may bring a direct suit against the corporation only when his or her "loss [is] personal and not a loss of the corporation." *Todd v. Zaldo*, 304 S.C. 275, 278, 403 S.E.2d 666, 668 (Ct.App.1991). However, "[u]nder [sections 33–18–400 to –430 of the South Carolina Code (2006)], in closely held corporations, a minority stockholder can maintain an action for managerial misconduct and other forms of oppression by majority stockholders." *Davis v. Hamm*, 300 S.C. 284, 291, 387 S.E.2d 676, 680 (Ct.App. 1989).

the record, Son seems to be the primary party who engaged in illegal activities and benefited from those activities. He received the benefits from his casing scheme. He was not re-elected as president of the Company, but was elected to serve as vice-president and receive the same salary. He chose to leave the Company and as a result to stop receiving a salary and other benefits he and the other the stockholders enjoyed, such as a company car and a gas credit card. He was the one stockholder who refused to repay the Company for personal expenses such as housekeeping services. Additionally, most of the testimony in the record indicates he had knowledge that adjusting the Company's inventory to diminish its tax liability was fraudulent. Based on all of this, the special referee did not err in finding he was not an oppressed shareholder. Accordingly, we affirm the special referee's decision to not order the Company buy Son's shares.[9]

## II. Amount of Shares Owned

Son contends he has physical possession of thirty percent of the Company's shares and is entitled to another twenty percent, which Mother and Father have refused to deliver. He maintains the special referee erred in determining he was not entitled to the twenty percent of the stock because the agreement providing for such was "illegal and unenforceable." We disagree.

 "An action for breach of contract is an action at law." *Electro–Lab of Aiken, Inc. v. Sharp Constr. Co. of Sumter*, 357 S.C. 363, 367, 593 S.E.2d 170, 172 (Ct.App.2004). "An illegal contract is unenforceable. The general rule is that courts will not enforce a contract which is violative of public policy, statutory law, or provisions of the Constitution." *Beach Co. v. Twillman, Ltd.*, 351 S.C. 56, 64, 566 S.E.2d 863, 866–67 (Ct.App.2002) (citation and internal quotation marks omitted). The court "will not lend its assistance to carry out the terms of a contract that violates statutory law or public

---

9. Accordingly, we need not address Son's arguments regarding valuation. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

policy." *Ward v. W. Oil Co.*, 387 S.C. 268, 274, 692 S.E.2d 516, 519 (2010) (internal quotation marks omitted).

Son's claim to the stock arises out of the retirement agreement and gift letter he had with Mother and Father. The special referee noted Son's claim was not included in his amended complaint. Further, it found the provisions of the document were not complied with as Father could not retire in light of Son's conduct and the additional rent payments were stopped. Additionally, the special referee determined it could not enforce "agreements which clearly, on their face, were illegal and unenforceable."

Son's argument on appeal does not address the special referee's ruling his claim was not pled. As to the agreement's illegality, he simply argues that the result is inequitable. Accordingly, we affirm this issue under the two-issue rule. See *Jones*, 387 S.C. at 346, 692 S.E.2d at 903 ("Under the two[-]issue rule, whe[n] a decision is based on more than one ground, the appellate court will affirm unless the appellant appeals all grounds because the unappealed ground will become the law of the case."). Further, the evidence supports the special referee's finding Son stopped complying with the terms of contract. Therefore, we affirm the special referee's decision.

## III. Fiduciary Duty

Son alleges the special referee erred in concluding the Masons did not breach their fiduciary duty to him. We disagree.

"[A] claim of breach of fiduciary duty is an action at law...." *Jordan*, 362 S.C. at 205, 608 S.E.2d at 131. "In an action at law, the appellate court will correct any error of law, but it must affirm the special referee's factual findings unless there is no evidence that reasonably supports those findings." *Linda Mc Co. v. Shore*, 390 S.C. 543, 555, 703 S.E.2d 499, 505 (2010) (citation omitted).

Controlling shareholders owe a fiduciary duty to minority shareholders. *Clearwater Trust v. Bunting*, 367 S.C. 340, 347, 626 S.E.2d 334, 337 (2006). "The common law fiduciary duty, first recognized in 1913, owed to shareholders

by corporate officers and directors has been codified by [sections] 33–8–300 and –420." *Id.* at 350, 626 S.E.2d at 339.

(a) An officer with discretionary authority shall discharge his duties under that authority:

(1) in good faith;

(2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and

(3) in a manner he reasonably believes to be in the best interests of the corporation and its shareholders.

(b) In discharging his duties an officer is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:

(1) one or more officers or employees of the corporation whom the officer reasonably believes to be reliable and competent in the matters presented; or

(2) legal counsel, public accountants, or other persons as to matters the officer reasonably believes are within the person's professional or expert competence.

S.C.Code Ann. § 33–8–420 (2006).

 "[U]nder South Carolina case law, a breach of this fiduciary duty must be pursued through a derivative, and not an individual, action." *Rivers v. Wachovia Corp.*, 665 F.3d 610, 617 (4th Cir.2011).

"The fiduciary obligation of dominant or controlling stockholders or directors is ordinarily enforceable through a stockholder's derivative action. . . ." *Brown*, 348 S.C. at 49, 557 S.E.2d at 684 (omission by court) (internal quotation marks omitted). "A shareholder may maintain an individual action only if his loss is separate and distinct from that of the corporation. A shareholder's suit is derivative if the gravamen of his complaint is an injury to the corporation and not to the individual interest of the shareholder." *Id.* (internal quotation marks omitted). "If misconduct by the management of a corporation has caused a particular loss to an individual stockholder, the liability for the mismanagement is an asset of the individual stockholder. Of course, a suit based on the misconduct can be brought by the individual stockholder." *Id.* at 49, 557 S.E.2d at 684–85 (internal quotation marks omitted).

"An individual action is also allowed if the alleged wrongdoers owe a fiduciary relationship to the stockholder and full relief to the stockholder cannot be had through a recovery by the corporation." *Id.* at 50, 557 S.E.2d at 685.

■ Because this is an issue of law, we must affirm the special referee's findings unless no evidence supports them. The record contains evidence Son perpetrated the fraudulent activities. Although Son testified he acted with Accountant's guidance and did not know his actions were not proper or legal, the special referee did not find Son's testimony credible in these matters. Several people, including others not named as parties in this suit, testified the Masons did not know Son was taking actions that were fraudulent. Further, because the fraudulent tax returns impact all of the shares equally, Son should have filed a derivative action. As the testimony supports the special referee's decision, we affirm this issue.

## IV. Aiding and Abetting

Son contends the special referee erred in failing to find Accountant aided and abetted the Masons in breaching their fiduciary duties to the shareholders of the company. We disagree.

■ Initially, Accountant contends Son did not perfect his appeal as to Accountant because he did not name Accountant as a respondent or attach a copy of the order regarding his cause of action against Accountant to his notice of appeal. Although he added Accountant as a respondent when he filed his amended notice of appeal within thirty days of the order, he did not attach a copy of the order relating to Accountant until he filed his second amended notice of appeal, which was more than thirty days after the underlying order had been filed. We disagree.

■ "Service of the notice of intent to appeal is a jurisdictional requirement, and the [c]ourt has no authority to extend or expand the time in which the notice of intent to appeal must be served." *Conner v. City of Forest Acres*, 348 S.C. 454, 461, 560 S.E.2d 606, 609 (2002). "Clerical errors in a notice of appeal do not destroy the appeal." *Charleston Lumber Co. v. Miller Hous. Corp.*, 318 S.C. 471, 478, 458

S.E.2d 431, 435 (Ct.App.1995). In *Charleston Lumber Co.*, the court rejected the respondent's attempt to have the appeal dismissed on jurisdictional grounds when the appellant neglected to appeal one of a series of cases tried together. *Id.* at 477–78, 458 S.E.2d at 435–36. In *Weatherford v. Price*, 340 S.C. 572, 578, 532 S.E.2d 310, 313 (Ct.App.2000), the court found that although the appellant "did not 'technically' appeal from the trial court's original order by referring to it in the Notice of Appeal, the [appellant] did attach a copy of the order to the Notice." The court found the appellant's omission was "of a clerical nature only and this [c]ourt has jurisdiction to hear the appeal." *Id.* In both *Weatherford*, 340 S.C. at 578, 532 S.E.2d at 313, and *Charleston Lumber*, 318 S.C. at 478, 458 S.E.2d at 436, the court noted the respondents were not prejudiced by the determination the court had jurisdiction over the appeal.

In *Conner*, 348 S.C. at 460–62, 560 S.E.2d at 609–10, the supreme court found the appellant's correction to her notice of appeal by adding two parties originally listed as defendants as respondents was not a clerical error; thus, the court determined notice to the two parties was untimely, requiring their dismissal from the appeal. The court noted the appellant waited nearly five months after filing the appeal to name the two parties as respondents and correspondence between the appellant and the court regarding the caption of the notice of appeal should have alerted her to the mistake much earlier. *Id.* at 462, 560 S.E.2d at 610.

In this case, Chief Judge Few issued an order on March 4, 2013, denying Accountant's motion to dismiss. However, in that order he stated, "[N]othing in this order prevents [Accountant] from raising this issue in his brief for the assigned panel to consider along with the merits of this appeal."

Unlike *Conner*, Son added Accountant as a respondent within the thirty days for filing an appeal. Although Son waited longer than thirty days to include the order relating the Accountant, he did add the order more timely than the appellant in *Conner*. We find the appeal was proper because Accountant at least had notice he was a party to the appeal within the time required to file an appeal from the special referee's decision.

The elements for a cause of action of aiding and abetting a breach of fiduciary duty are[ ] (1) a breach of a fiduciary duty owed to the plaintiff; (2) the defendant's knowing participation in the breach; and (3) damages. The gravamen of the claim is the defendant's knowing participation in the fiduciary's breach.

*Gordon v. Busbee*, 397 S.C. 119, 133, 723 S.E.2d 822, 830 (Ct.App.2012) (citation and internal quotation marks omitted).

As discussed above, the special referee did not err in determining the Masons did not breach their fiduciary duty to Son. Accordingly, because no breach of fiduciary occurred, Accountant could not have knowingly participated in a breach of that duty. Therefore, we affirm this issue.

## V. Civil Conspiracy

Son argues the special referee erred in failing to find the Masons engaged in a civil conspiracy to loot the Company at the expense of Son. We disagree.

An action for civil conspiracy is normally an action at law. *McMillan v. Oconee Mem'l Hosp., Inc.*, 367 S.C. 559, 564, 626 S.E.2d 884, 886 (2006). "However, the character of an action as legal or equitable depends on the relief sought. When equitable relief is sought in an action in tort[,] the action is one in equity." *Soden*, 333 S.C. at 574, 511 S.E.2d at 382.

"The elements of a civil conspiracy in South Carolina are (1) the combination of two or more people, (2) for the purpose of injuring the plaintiff, (3) which causes special damages." *Pye v. Estate of Fox*, 369 S.C. 555, 566–67, 633 S.E.2d 505, 511 (2006). "[I]n order to establish a conspiracy, evidence, direct or circumstantial, must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise." *Id.* at 567, 633 S.E.2d at 511 (alteration by court) (internal quotation marks omitted).

Conspiracy may be inferred from the very nature of the acts done, the relationship of the parties, the interests of the alleged conspirators, and other circumstances. Civil conspiracy is an act which is by its very nature covert and clandestine and usually not susceptible of proof by direct

evidence.... An action for civil conspiracy is an action at law; the trial judge's findings will be upheld on appeal unless they are without evidentiary support.

*Id.* (omission by court) (citations and internal quotation marks omitted).

The gravamen of the tort of civil conspiracy is the damage resulting to the plaintiff from an overt act done pursuant to the combination, not the agreement or combination per se. [A]n unlawful act is not a necessary element of the tort. Because the quiddity of a civil conspiracy claim is the damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other causes of action.

*Id.* at 567–68, 633 S.E.2d at 511 (alteration by court) (citations and internal quotation marks omitted).

The special referee found:

If the value of Son's stock has indeed been impaired, Son need not look further than his own actions in filing false and inaccurate tax returns, diverting Company funds through the casing scheme, payment of personal expenses (including attorney[']s fees) from Company funds and working on an expansion of the Company business to include (for the first time) Company ownership of land and building from which the Conway Store is operated, and diverting Company funds for operation of a non-company owned entity (BCJ Tires).

The special referee also found Son did not establish "any special damages arising out of the alleged conspiracy." Son did not allege anything in his complaint distinct from his other causes of action in his claim for civil conspiracy. He did state the Masons had "conspired to cause special damages to [Son] in such a way that [Son] will not receive the fair value of his stock in the [Company] or the opportunity to effectively manage the business affairs of the [Company]."

Son requests actual and punitive damages for the civil conspiracy. Accordingly, this is an action at law, and this court should affirm if the evidence supports the special referee's findings. Because the evidence, including the testimony provided by the Masons, Accountant, and others, supports the special referee's findings, we affirm this issue.

## VI. Constructive Discharge

Son argues the Masons violated public policy and wrongfully and constructively discharged Son from his employment with the Company. We disagree.

 "An action for breach of contract is an action at law." *Electro–Lab of Aiken,* 357 S.C. at 367, 593 S.E.2d at 172. An action for damages for wrongful discharge is action at law. *Wallace v. Milliken & Co.,* 305 S.C. 118, 120, 406 S.E.2d 358, 359 (1991). *But see id.* ("An employee, discharged in retaliation for instituting a Workers' Compensation Claim, is entitled to lost wages and reinstatement. Reinstatement is equitable relief, payment of back wages being merely an integral part of the remedy. Moreover, lost wages are deemed restitution, itself an equitable remedy." (citations omitted)).

"Where the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." *Ludwick v. This Minute of Carolina, Inc.,* 287 S.C. 219, 225, 337 S.E.2d 213, 216 (1985). "Under the public policy exception to the at-will employment doctrine . . . an at-will employee has a cause of action in tort for wrongful termination where there is a retaliatory termination of the at-will employee in violation of a clear mandate of public policy." *McNeil v. S.C. Dep't of Corr.,* 404 S.C. 186, 191, 743 S.E.2d 843, 846 (Ct.App.2013) (internal quotation marks omitted).

> [T]he public policy exception is invoked when an employer requires an at-will employee, as a condition of retaining employment, to violate the law. . . . In a nation of laws the mere encouragement that one violate the law is unsavory; the threat of retaliation for refusing to do so is intolerable and impermissible.

*Ludwick,* 287 S.C. at 225, 337 S.E.2d at 216.

 Mother, Father, Sister, and other employees testified that Son stopped working voluntarily. The special referee found the evidence was uncontroverted that Son stopped working voluntarily. As an action for breach of contract is an action at law and evidence supports the special referee's findings, we affirm.

## VII. Counterclaims

Son argues the special referee erred in awarding judgment to the Masons and the Company on their counterclaims. We disagree.

"An action for conversion is an action at law." *Moore v. Benson*, 390 S.C. 153, 162, 700 S.E.2d 273, 278 (Ct.App.2010). "Therefore, we review the record to determine if any evidence supports the [special referee's] finding." *Id.*

Conversion is defined as the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the owner's rights. Money may be the subject of conversion when it is capable of being identified and there may be conversion of determinate sums even though the specific coins and bills are not identified.

*Moore v. Weinberg*, 383 S.C. 583, 589, 681 S.E.2d 875, 878 (2009) (citation omitted).

We affirm the special referee's decision to award the Masons and the Company damages for their counterclaim for conversion for Son's paying his attorney with the Company's funds. Son retained the attorney to represent himself, not the Company. Additionally, the special referee did not err in finding for the Masons and the Company as to their counterclaim for Son's casing scheme. Based on the testimony, Son recorded fake inventory and then paid himself for it. Accordingly, the special referee did not err in finding for the Masons and the Company on their conversion claim for the casing scheme. As to the claims for damages as a result of Son's filing false tax returns, the special referee did not err in finding a claim for the damages from the filing of false returns could be brought later. The amount of damages could not be determined at the time because the Internal Revenue Service had not yet made a determination as to how much the Company owed in back taxes and fees.

## VIII. Attorney's Fees

Son contends he is entitled to attorney's fees and expenses. We disagree. Son argues because he should have won his action at trial, he is entitled to attorney's fees. Because we

affirm the special referee's decisions, we have no reason to award Son attorney's fees.

## CONCLUSION

We affirm the special referee's orders.

HUFF and SHORT, JJ., concur.